# IN THE SUPREME COURT OF IOWA

No. 13–1329

Filed October 24, 2014

**STATE OF IOWA,**

Appellee,

vs.

**ZACHARIAH J. ROGERSON,**

Appellant.

---

Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley, Judge.

The defendant in a criminal case brings an interlocutory appeal from the district court's pretrial order allowing several of the State's witnesses to testify by two-way videoconference. **REVERSED AND REMANDED.**

Brian D.W. Spannagel, Boffeli & Spannagel, P.C., Dubuque, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, and Ralph Potter, County Attorney, for appellee.

**MANSFIELD, Justice.**

This case requires us to decide when the Sixth Amendment permits a witness to appear by live, two-way video instead of testifying in person. In a prosecution for four counts of serious injury by operating a motor vehicle while intoxicated, *see* Iowa Code § 707.6A(4) (2013), the State moved to allow three out-of-state victims of the car accident and three state-employed lab analysts to testify via a two-way videoconferencing system. The defendant objected, contending the remote testimony would violate his Sixth Amendment right to be confronted with the witnesses against him. The district court held a hearing on the motion and granted the State's request for the witnesses to testify remotely. The defendant filed an application for an interlocutory appeal, which we granted.

Applying Sixth Amendment precedent, we now hold that two-way videoconference testimony should not be substituted for in-person confrontation absent a showing of necessity to further an important public interest. Because the grounds advanced by the State do not reach that level, we hold the district court erred in allowing the videoconference testimony. Therefore, we reverse the district court's order and remand for further proceedings.

## I. Background Facts and Proceedings.

According to the minutes of testimony, early in the morning on August 13, 2012, the defendant, Zachariah Rogerson, was involved in a single-vehicle car accident on Hales Mill Road in Dubuque County. Dubuque County sheriff's deputies responding to the scene encountered four other people at the crash site, all of whom were injured. Kyle Rohman suffered a shattered elbow, fractured ribs, and a partially collapsed lung. Kelly Barrett's sternum was cracked and her back

fractured. Jack Cole's injuries included fractured ribs, a cracked collarbone, and a collapsed lung. Terrie Totse was airlifted to University of Iowa Hospitals and Clinics for treatment of her broken back and shoulder.

Two of the injured parties identified Rogerson as the driver of the wrecked vehicle. Sergeant Pothoff of the Dubuque County Sheriff's Office made contact with Rogerson at the scene of the accident and detected an odor of an alcoholic beverage on his breath. Rogerson was transported to Mercy Hospital Emergency Room where he was sedated and intubated. The attending physician, Dr. Gudenkauf, signed a "Dead or Unconscious" form indicating that Rogerson was physically unable to give consent to a blood alcohol content test. Deputies then obtained a blood draw showing Rogerson's blood alcohol content to be .150.

The State charged Rogerson with four counts of unintentionally causing serious injury by intoxicated use of a motor vehicle. *See* Iowa Code § 707.6A(4). Rogerson entered a plea of not guilty to all four counts. Before trial, the State filed a motion requesting that several of its witnesses be permitted to testify remotely via two-way videoconferencing technology rather than physically appearing in court. In its motion, the State asserted that three of the parties injured in the crash, Rohman, Barrett, and Totse, resided outside the state of Iowa and that remote video "testimony would greatly expedite and facilitate their participation in the Trial." The motion also sought authorization for three employees of the Division of Criminal Investigation (DCI) Criminalistics Laboratory

to testify remotely because they worked in Ankeny, and their testimony was "not dependent upon the specific fact pattern of this case."[1]

Rogerson opposed the State's motion, arguing that permitting the witnesses to testify via videoconferencing technology would violate his Sixth Amendment right to be confronted with the witnesses against him. Rogerson explained that video testimony was not an adequate substitute for face-to-face confrontation. He urged the trial court to deny the State's motion because there were no special circumstances justifying remote testimony.

The trial court held a hearing on the motion for distance testimony. At the hearing, the State reiterated its arguments that remote videoconferencing would facilitate the testimony of its out-of-state witnesses and of the state lab technicians. The State posited two-way videoconferencing fulfilled the Sixth Amendment confrontation requirement because both the defendant and witness could simultaneously see and hear each other. The prosecution stated that its witnesses had suffered "serious injury" during the accident but did not present any evidence from doctors or the witnesses themselves that they were unable to travel at the time set for the trial. With respect to the DCI employees, the State emphasized the convenience of "them walking down the hall and testifying" via videoconference rather than "giving up a day, at least coming up from the State lab in [Ankeny]" to testify.

In opposition to the motion, Rogerson argued that the State had failed to show that it was necessary, rather than merely convenient, for its witnesses to testify remotely. Rogerson again stated his concern that

---

[1]Ankeny is approximately 200 miles driving distance from Dubuque, where trial would be held.

permitting videoconference testimony would violate his Sixth Amendment confrontation right. He urged the court to adopt a standard requiring the State to prove the necessity of distance testimony before allowing witnesses to testify via two-way video.

The trial court granted the State's motion for distance testimony. The court explained,

> The statements to be offered by the Division of Criminal Investigation through [its employees] are non-testimonial and are factual. Therefore, the use of the ICN[2] network for the presentation of their testimony is deemed not to violate the confrontation[] clause.
>
> The primary purpose of the confrontation clause is to secure the opponent the opportunity of cross-examination. The secondary purpose of the confrontation clause is to enable the judge and the jury to obtain the elusive and incommunicable evidence of a witness's deportment while testifying. To allow the witnesses who are residing outside of the State of Iowa with the opportunity to appear on the ICN network provides the Defendant with an opportunity for cross-examination. The personal presence of these individuals over the network, which transmits their image simultaneously, allows the judge and the jurors the opportunity to observe the witness during testimony. Any non-verbal communication may be therefore viewed during this live testimony. It is therefore deemed that the use of the ICN network to permit the injured named victims the opportunity to remain in a place of comfort during their recuperation period to provide testimony in this trial does not violate the Defendant's rights under the confrontation clause.

(Citations omitted.)

Rogerson applied to this court for permission to bring an interlocutory appeal, again asserting that the trial court's decision to permit the State's witnesses to testify remotely violated his constitutional

---

[2]The Iowa Communications Network (ICN) is a statewide, governmental network that includes a two-way videoconferencing system. *See generally* Iowa Communications Network, http://www.icn.iowa.gov/ (last visited October 13, 2014).

right to be confronted by the witnesses against him. He contended that the district court had applied the wrong standard for determining whether two-way video testimony in a criminal trial is permissible. He further urged that the State failed to meet its burden under the correct standard.

We granted Rogerson's application to proceed with an interlocutory appeal and retained the case.

**II. Standard of Review.**

We review constitutional claims, including those based on the Confrontation Clause, de novo. *State v. Schaer*, 757 N.W.2d 630, 633 (Iowa 2008).

**III. Analysis.**

**A. Constitutionality of Two-Way Video Testimony Under the Confrontation Clause.** The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.[3] Courts have long construed the Confrontation Clause to "guarantee[] the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2801, 101 L. Ed. 2d 857, 864 (1988). In *Coy*, the United States Supreme Court referenced both history and precedent, emphasizing the fundamental role that face-to-face confrontation has always played in judicial proceedings:

---

[3]In his appellate brief, Rogerson also maintains that article 1, section 10 of the Iowa Constitution requires reversal of the trial court's decision. Because we agree with Rogerson's argument under the United States Constitution, we do not need to reach his contentions under the Iowa Constitution or determine whether they have been preserved.

The Sixth Amendment's guarantee of face-to-face encounter between witness and accused serves ends related both to appearances and to reality. This opinion is embellished with references to and quotations from antiquity in part to convey that there is something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution." What was true of old is no less true in modern times.

*Id.* at 1017, 108 S. Ct. at 2801, 101 L. Ed. 2d at 864–65 (quoting *Pointer v. Texas*, 380 U.S. 400, 404, 85 S. Ct. 1065, 1068, 13 L. Ed. 2d 923, 926 (1965)).

In subsequent cases, however, the Supreme Court has clarified that while the Confrontation Clause does express a strong preference for face-to-face confrontation, the latter is not an absolute constitutional requirement. *See Maryland v. Craig*, 497 U.S. 836, 849–50, 110 S. Ct. 3157, 3165–66, 111 L. Ed. 2d 666, 680–82 (1990). This preference for face-to-face confrontation " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* at 849, 110 S. Ct. at 3165, 111 L. Ed. 2d at 681 (quoting *Mattox v. United States*, 156 U.S. 237, 243, 15 S. Ct. 337, 339–40, 39 L. Ed. 409, 411 (1895)).

In *Craig*, the trial court permitted a child victim of sexual abuse to testify via a one-way, closed-circuit television system under which the defendant could see and hear the testimony, but the child could neither see nor hear the defendant. *See id.* at 840–42, 110 S. Ct. at 3160–61, 111 L. Ed. 2d at 675–76. The Court set forth a two-prong test to determine when face-to-face confrontation with a child victim of alleged sexual abuse may be excused and one-way, closed-circuit television testimony used in its place. In such cases, the State must prove: (1) that the "denial of [face-to-face] confrontation is necessary to further an important public policy," and (2) that "the reliability of the testimony is otherwise assured." *Id.* at 850, 110 S. Ct. at 3166, 111 L. Ed. 2d at 682.

Under this test, the *Craig* Court determined that protecting child abuse victims from the psychological harm of testifying was a sufficiently important public policy concern to justify denying face-to-face confrontation. *Id.* at 853, 110 S. Ct. at 3167, 111 L. Ed. 2d at 683. Then, applying the second prong, the Court held that Maryland's closed-circuit video system assured the reliability of remote testimony because the witness testified under oath; the defendant was still able to fully cross-examine the witness; and the judge, jury, and defendant could see the witness's demeanor and body language as he or she testified. *Id.* at 857, 110 S. Ct. at 3170, 111 L. Ed. 2d at 686. The Court emphasized that, although it had approved remote testimony in the *Craig* scenario, substituting video for live testimony in other cases would require a fact-specific finding of necessity. *Id.* at 855, 110 S. Ct. at 3169, 111 L. Ed. 2d at 685.

Since deciding *Craig* twenty-four years ago, the Supreme Court has not further examined the constitutionality of remote video testimony. Justice Scalia has twice dissented from the Court's denials of certiorari in cases involving the remote testimony of child abuse witnesses because he believed the lower courts had inappropriately expanded the exception to face-to-face confrontation. *Marx v. Texas*, 528 U.S. 1034, 1034–35, 120 S. Ct. 574, 575, 145 L. Ed. 2d 436, 437 (1999) (mem.) (Scalia, J., dissenting from denial of certiorari) (criticizing the expansion of the exception to face-to-face confrontation where the trial court allowed a witness who had been abused by the defendant in a prior incident to testify remotely upon a finding that there might be emotional trauma); *Danner v. Kentucky*, 525 U.S. 1010, 1011, 119 S. Ct. 529, 530, 142 L. Ed. 2d 439, 440 (1998) (mem.) (Scalia, J., dissenting from denial of certiorari) (disagreeing that a fifteen-year-old witness who expressed only

some apprehension at testifying in front of her alleged abuser should be permitted to testify through video).

The Court also has not had occasion to consider the constitutionality of new types of video technology available to facilitate remote testimony. *Craig* involved a one-way video system in which the witness could not see or hear the defendant, but the defendant, judge, and jury could see and hear the witness. 497 U.S. at 840–42, 110 S. Ct. at 3160–61, 111 L. Ed. 2d at 675–76. In contrast, two-way video systems—like the one at issue in this case—allow both the defendant and the witness to see and hear one another simultaneously during the testimony.

Thus, the Supreme Court has not decided what test should govern two-way video testimony. *See Wrotten v. New York*, 560 U.S. 959, 960, 130 S. Ct. 2520, 2520–21, 177 L. Ed. 2d 316, 316 (2010) (Sotomayor, J., respecting denial of certiorari) (noting some differences between one- and two-way video and stating that the Court has not yet decided the appropriate standard to govern two-way testimony). The Court did reject a proposed change to Federal Rule of Criminal Procedure 26, however, that would have permitted unavailable witnesses to testify via two-way video. *Order of the Supreme Court*, 207 F.R.D. 89, 91 (2002). In an accompanying statement, Justice Scalia wrote, "I share the majority's view that the Judicial Conference's proposed Fed. Rule Crim. Proc. 26(b) is of dubious validity under the Confrontation Clause of the Sixth Amendment to the United States Constitution . . . ." *Id.* at 93 (statement of Scalia, J.). He added,

> As we made clear in *Craig*, a purpose of the Confrontation Clause is ordinarily to compel accusers to make their accusations *in the defendant's presence*—which is not equivalent to making them in a room that contains a

> television set beaming electrons that portray the defendant's image. Virtual confrontation might be sufficient to protect virtual constitutional rights; I doubt whether it is sufficient to protect real ones.

*Id.* at 94 (citation omitted). Justice Scalia expressed skepticism that two-way video technology was constitutionally distinct from the one-way system examined in *Craig*: "I cannot comprehend how one-way transmission (which *Craig* says does not ordinarily satisfy confrontation requirements) becomes transformed into full-fledged confrontation when reciprocal transmission is added." *Id.* Justice Breyer, joined by Justice O'Connor, dissented from the Court's refusal to submit the proposed rule to Congress. *Id.* at 96 (dissenting statement of Breyer, J.).

Thus, we need to determine here if the standard set forth in *Craig* applies to two-way videoconferencing technology. If we do apply the *Craig* test, we must assess whether an adequate finding of necessity exists in this case to warrant denying face-to-face confrontation. Rogerson argues that remote testimony of any kind is less satisfactory than face-to-face confrontation and therefore urges that the *Craig* standard should govern both one- and two-way video testimony. The State maintains that two-way videoconferencing is distinct from one-way, closed-circuit television and asks that we find two-way video to be an adequate substitute for live testimony and therefore not violative of the Confrontation Clause.

Until now, Iowa courts have seemingly used the *Craig* test only in the scenario for which it was designed, i.e., in determining when to permit child victims of abuse to testify via *one-way* video systems. For example, in *State v. Rupe*, we employed the *Craig* standard and permitted a minor sexual abuse victim to testify via closed circuit television because the State presented evidence that the child would suffer

emotional trauma if he were required to testify in the defendant's presence. 534 N.W.2d 442, 443–44 (Iowa 1995). Our opinion did not mention whether the video system was one- or two-way, and we have not addressed the potential constitutional distinctions between one-way and two-way video testimony. *See id.*

Other courts, however, have addressed the constitutional significance of one- versus two-way video systems under the Sixth Amendment. The vast majority of those courts have chosen to apply *Craig* to both one- and two-way videoconferencing; only the United States Court of Appeals for the Second Circuit has formulated a standard distinct from *Craig*'s necessity test to govern the constitutionality of two-way video testimony. For example, the Eighth Circuit applied *Craig* in determining the constitutionality of two-way video testimony of child abuse victims in *United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005). The court reasoned that although two-way videoconferencing might better approximate face-to-face confrontation than one-way video, it was nevertheless virtual and less desirable than in-person testimony. *Id.* The court stated " 'confrontation' via a two-way closed circuit television is not constitutionally equivalent to a face-to-face confrontation." *Id.* The *Bordeaux* court attributed the problem in part to the prevalence of entertainment technology: "Given the ubiquity of television, even children are keenly aware that a television image of a person (including a defendant in the case of a two-way system) is not the person [and] something is lost in the translation." *Id.* As the Eighth Circuit put it,

> The virtual "confrontations" offered by closed-circuit television systems fall short of the face-to-face standard because they do not provide the same truth-inducing effect. The Constitution favors face-to-face confrontations to reduce

> the likelihood that a witness will lie. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' " . . . [T]he touchstone for deciding whether a "confrontation" satisfies the Constitution is whether it is likely to lead a witness to tell the truth to the same degree that a face-to-face confrontation does, and in this respect two-way systems are like one-way systems: they both fall short.

*Id.* (quoting *Coy*, 487 U.S. at 1019, 108 S. Ct. at 2802, 101 L. Ed. 2d at 866). Because of its concerns about virtual confrontation of any kind, the Eighth Circuit chose to apply the *Craig* standard to two-way as well as one-way video systems. *Id.* at 554–55.

The Eleventh Circuit also followed *Craig* to invalidate the use of two-way video testimony for witnesses who resided in Australia and refused to travel to the United States for trial. *United States v. Yates*, 438 F.3d 1307, 1315–16 (11th Cir. 2006). Like the Eighth Circuit, it expressed concern that virtual confrontation, even through a two-way system, fell short of the Confrontation Clause's promise:

> The simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation. . . . [T]he two are not constitutionally equivalent. The Sixth Amendment's guarantee of the right to confront one's accuser is most certainly compromised when the confrontation occurs through an electronic medium.

*Id.* at 1315 (citation omitted). In applying the first prong of the *Craig* test, the court held that the government's stated interests of "expeditiously and justly resolving the case" and "providing the fact-finder with crucial evidence" were not necessary to further an important public interest. *Id.* at 1315–16. The court thus ruled that the use of two-way video testimony violated the defendant's confrontation right and ordered a new trial. *Id.* at 1319.

Several state appellate courts have also utilized *Craig* as the standard for assessing the constitutionality of two-way video testimony.

In a recent case, the New Mexico Court of Appeals held that allowing a state-employed scientific analyst to testify by two-way video about the defendant's blood alcohol content violated the Confrontation Clause because the trial court had not determined that such remote testimony was necessary to further an important public interest. *State v. Smith*, 308 P.3d 135, 136 (N.M. Ct. App. 2013). The *Smith* court agreed with the Eighth Circuit that the "[v]irtual presence created by television falls short of physical presence in satisfying the elements of confrontation." *Id.* at 137. Similarly, the Superior Court of Pennsylvania has applied *Craig* to hold that allowing an imprisoned witness to testify via two-way videoconferencing technology without a finding of necessity violates the Confrontation Clause. *Commonwealth v. Atkinson*, 987 A.2d 743, 751–52 (Pa. Super. Ct. 2009). The court noted the opinions of the Eighth and Eleventh Circuits that two-way video testimony should be subjected to the same high standard as one-way testimony. *Id.* at 750 (citing *Yates*, 438 F.3d at 1313–14).

The Florida Supreme Court likewise declined to allow two-way video testimony in lieu of face-to-face confrontation without a showing of necessity. *Harrell v. State*, 709 So. 2d 1364, 1368–69 (Fla. 1998). Much as the State urges us to do in the present case, the State of Florida asked the court to permit two-way video testimony in lieu of live testimony whenever the prosecution desired, calling it "the equivalent of physical, face-to-face confrontation." *Id.* at 1368. Declining to adopt such a blanket rule, the court instead employed *Craig*'s two-part test. *Id.* at 1369. It stated,

> We are unwilling to develop a per se rule that would allow the vital fabric of physical presence in the trial process to be replaced at any time by an image on a screen. . . . [W]e do not conclude that virtual presence is the equivalent of

physical presence for the purposes of the Confrontation Clause.

*Id.* at 1368–69. The *Harrell* court ultimately found adequate state interests justifying two-way video testimony because the Argentine witnesses were beyond the court's subpoena power, they were essential to the case, and one of the witnesses was too ill to make the trip to the United States. *Id.* at 1369–70.

The Michigan Court of Appeals similarly adopted *Craig* as the test to determine when two-way video testimony infringes a defendant's confrontation right. *People v. Buie*, 775 N.W.2d 817, 825 (Mich. Ct. App. 2009). Citing the Eighth Circuit's reasoning in *Bordeaux*, the court noted " 'the intangible but crucial differences between a face-to-face confrontation and a 'confrontation' that is electronically created by cameras, cables, and monitors.' " *Id.* (quoting *Bordeaux*, 400 F.3d at 554–55). It concluded that the state had not given a justification for why its expert witnesses needed to testify remotely and remanded the case for the trial court to make a necessity determination in line with *Craig*. *Id.* at 826.

In addition to the foregoing courts that have expressly considered the differences between one- and two-way video systems and determined that the *Craig* standard should govern both, a number of other courts have applied *Craig* to both types of systems without separate analysis. *See, e.g., United States v. Weekley*, 130 F.3d 747, 753–54 (6th Cir. 1997) (applying *Craig*'s necessity standard to a two-way video system without discussion of the one-way/two-way distinction); *United States v. Garcia*, 7 F.3d 885, 887–88 (9th Cir. 1993) (same); *United States v. Farley*, 992 F.2d 1122, 1124–25 (10th Cir. 1993) (same); *State v. Stock*, 256 P.3d 899, 905 (Mont. 2011) (same); *People v. Beltran*, 970 N.Y.S.2d 289, 296

(App. Div. 2013) (same); *State v. Seelig*, 738 S.E.2d 427, 434 (N.C. Ct. App. 2013) (same); *Gonzales v. State*, 818 S.W.2d 756, 764 (Tex. Crim. App. 1991) (same); *Johnson v. Commonwealth*, 580 S.E.2d 486, 491 (Va. Ct. App. 2003) (same); *Bush v. State*, 193 P.3d 203, 215–16 (Wyo. 2008) (same). A federal trial court in Washington was asked to assess the constitutionality of allowing a foreign witness in a drug smuggling case to testify by two-way videoconference. *United States v. Rosenau*, 870 F. Supp. 2d 1109, 1112 (W.D. Wash. 2012). The court applied *Craig* without specifically discussing whether it should govern two-way as opposed to one-way video testimony. *Id.* at 1112–13. The court noted that the two-way nature of the video system was an added assurance of adequate confrontation, but nevertheless required the state to demonstrate video testimony was necessary to further an important public interest in accordance with the *Craig* test. *Id.* at 1113.

In contrast to the numerous courts that have applied the *Craig* test to two-way as well as one-way videoconferencing technology, the Second Circuit alone has declined to require a finding of *Craig*-based necessity before allowing witnesses to testify via two-way video. *United States v. Gigante*, 166 F.3d 75, 81 (2d. Cir. 1999).[4] In *Gigante*, the Second Circuit upheld the trial court's decision to allow an ill witness to testify remotely via two-way videoconference. *Id.* Rather than assessing the need for remote technology under *Craig*, the Second Circuit formulated a test based upon the federal standard for when depositions may be used to

---

[4]A Minnesota case appeared to read *Craig* and *Gigante* as consistent with one another. *State v. Sewell*, 595 N.W.2d 207, 212 (Minn. Ct. App. 1999). The court stated that to allow a witness to testify via video technology, a court must first determine the witness cannot appear in person and show the necessity of his testimony, *id.* (citing *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166, 111 L. Ed. 2d at 681–82), and then assess the reliability of the testimony using the factors set forth in *Gigante*, 166 F.3d at 80, *id.* at 212–13.

perpetuate testimony for trial purposes. *Id.* (citing Fed. R. Crim. P. 15(a)).[5] The court reasoned that two-way closed circuit television "afforded greater protection of Gigante's confrontation rights than would have been provided by a Rule 15 deposition," since the witness actually had to testify live before the jury (although not in their actual presence). *Id.* Therefore, the Second Circuit held that "[u]pon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." *Id.* The court determined that witness's terminal illness and his status in the witness protection program satisfied the "exceptional circumstances" requirement and therefore upheld the trial court's use of two-way video testimony. *Id.* at 81–82.

The *Gigante* court listed what it saw as the four primary benefits of face-to-face confrontation: "1) the giving of testimony under oath; 2) the

---

[5]Federal Rule of Criminal Procedure 15(a)(1) provides in part:

A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice.

We have a similar rule in Iowa:

Whenever the interests of justice and the special circumstances of a case make necessary the taking of the testimony of a prospective witness not included in rule 2.13(1) or 2.13(3), for use at trial, the court may upon motion of a party and notice to the other parties order that the testimony of the witness be taken by deposition . . . . For purposes of this subsection, special circumstances shall be deemed to exist and the court shall order that depositions be taken only upon a showing of necessity arising from either of the following:

. . . .

(2) Other just cause necessitating the taking of the deposition.

Iowa R. Crim. P. 2.13(2)(*a*); *see generally State v. Rainsong*, 807 N.W.2d 283 (Iowa 2011) (discussing this provision).

It should be noted, of course, that when such a deposition is taken, the defendant normally is present. *See* Fed. R. Crim. P. 15(c); *State v. Turner*, 345 N.W.2d 552, 559 (Iowa Ct. App. 1983).

opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and 4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence." *Id.* at 80. The court found these four components satisfied by the two-way system because the witness was sworn, he was subject to cross-examination, he testified in full video-view of the jury and judge, and he testified with the defendant watching. *Id.*

Upon our review, we agree with the vast majority of courts that have considered the issue and determined that *Craig*'s test should apply to two-way as well as one-way video testimony. Concededly, two-way videoconferencing technology available today more closely approximates face-to-face confrontation than one-way video. But despite its preferability over one-way transmission, we do not believe two-way videoconferencing is constitutionally equivalent to the face-to-face confrontation envisioned by the Sixth Amendment. In *Craig,* the Court stated that it is

> [t]he *combined* effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—[that] serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.

497 U.S. at 846, 110 S. Ct. at 3163, 111 L. Ed. 2d at 678–79 (emphasis added). Only the combination of all of these elements of confrontation—including face-to-face testimony—fully protects a defendant's Sixth Amendment rights.

Our founders presumably believed that accusers would be more reluctant to make false accusations when they were in the personal presence of the accused. "A witness 'may feel quite differently when he

has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.'" *Coy*, 487 U.S. at 1019, 108 S. Ct. at 2802, 101 L. Ed. 2d at 866 (quoting Zechariah Chafee, Jr., *The Blessings of Liberty* 35 (1956)). Technology has changed since the late eighteenth century, but human nature has not. This social pressure to tell the truth can be diminished when the witness is far away rather than physically present with the defendant in the courtroom. The Supreme Court has expressed a strong preference for in-person encounters between witnesses and defendants that no form of virtual testimony can fully satisfy. Two-way video technology may permit the witness and defendant to see one another, but the screen and the physical distance between the two tend to reduce the truth-inducing effect of the confrontation. The Supreme Court has recognized "that face-to-face confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." *Craig*, 497 U.S. at 846, 110 S. Ct. at 3164, 111 L. Ed. 2d at 679. Remote testimony of any kind should not be lightly substituted in its place.

In addition to having the right to be confronted by witnesses against him, the criminal defendant is also entitled to be present for all critical phases of the proceedings. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484, 84 L. Ed. 2d 486, 490 (1985); *see also Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 1058, 25 L. Ed. 2d 353, 356 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom . . . ."). The Supreme Court has explained that the right to be present is grounded in both the Confrontation Clause and the Due Process Clause:

> [W]e have recognized that [the right to presence] is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. . . . [A] defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence . . . ."

*Gagnon*, 470 U.S. at 526, 105 S. Ct. at 1484, 84 L. Ed. 2d at 490. (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 107–08, 54 S. Ct. 330, 332, 333, 78 L. Ed. 674, 678, 679 (1934)).

Like the confrontation right, the related right to be present ensures the integrity of criminal proceedings because the defendant's presence impresses the gravity of the proceedings upon the participants. *See Crosby v. United States*, 506 U.S. 255, 259, 113 S. Ct. 748, 751, 122 L. Ed. 2d 25, 31 (1993) ("This [common law right to be present] was premised on the notion that a fair trial could take place only if the jurors met the defendant face-to-face and only if those testifying against the defendant did so in his presence."). Yet this right to be present loses some meaning if witnesses are permitted to appear on a video monitor. We therefore find that in-person testimony should be excused only in the rare situations recognized in *Craig*.

Hence, before permitting a witness to testify via two-way videoconference, the court must make a case-specific determination that the denial of the defendant's confrontation right is necessary to further an important public interest. If the court finds such an interest, it must assure the reliability of the remote testimony. *See Craig*, 497 U.S. at 851, 110 S. Ct. at 3166, 111 L. Ed. 2d at 682.

Here, the State not only would have us depart from *Craig*, it wants to go beyond *Gigante*. It contends that two-way video is constitutionally

equivalent to live, in-person confrontation and asks us to declare the two interchangeable. No court to our knowledge has gone so far as to adopt a rule permitting two-way videoconferencing testimony simply upon the government's request. Even the *Gigante* court, which rejected the application of *Craig* to two-way video testimony, still required a finding of "exceptional circumstances" before excusing face-to-face confrontation. *Gigante*, 166 F.3d at 81. While permitting two-way video testimony under the facts of that case, the court cautioned that "the use of remote, closed-circuit television testimony must be carefully circumscribed." *Id.* at 80.

The State's proposal also presents logistical problems. Although a witness can be placed under oath when testifying remotely, the State does not explain how a court in one state could hold a recalcitrant witness in contempt when he or she is located hundreds of miles away in another jurisdiction. *See, e.g.*, *United States v. Sanford, Ltd.*, 860 F. Supp. 2d 1, 10 (D.D.C. 2012) ("[F]oreign depositions are suspect and, consequently, not favored, due, in significant part, to the fact that the witness is not subject to the imposition of sanctions of perjury or contempt for testifying falsely or evasively." (Internal quotation marks and citations omitted.)). Impeachment of a witness with documents or prior statements also becomes more cumbersome and less attention-grabbing when performed through a video connection. Furthermore, technological limitations could prevent the jury from adequately observing the witness's demeanor.

We are aware that technology evolves and improves all the time. Some day virtual electronic presence in the courtroom may become an adequate constitutional substitute for actual physical presence. But we are not there yet. Because face-to-face confrontation is constitutionally

preferable to remote testimony of any kind, we believe *Craig* applies to two-way video testimony, which should be acceptable only upon a showing of necessity to further an important public interest and only when the testimony's reliability can be otherwise assured.

**B. Applying the *Craig* Standard Here.** Guided by *Craig*, we turn now to whether the justifications shown by the record in this case qualify as sufficiently important to allow the State to present remote video testimony. This is the necessity prong of the *Craig* test, and we believe it is sufficient to resolve the present dispute. As recognized in *Craig*, protecting child victims from the trauma of testifying in front of their alleged abusers can justify remote testimony in certain cases. *Craig*, 497 U.S. at 853, 110 S. Ct. at 3167, 111 L. Ed. 2d at 683; *see also Rupe*, 534 N.W.2d at 444.

Illness has been another justification that courts have found sufficient to satisfy the *Craig* "necessity" prong. For example, in *Bush*, the witness in question lived out of the state and had suffered congestive heart failure, rendering him unable to appear personally at trial. 193 P.3d at 214. The court concluded that permitting the seriously ill witness's "testimony via video conference was necessary to further the important public policy of preventing further harm to his already serious medical condition." *Id.* at 215–16. Additionally, the North Carolina Court of Appeals approved remote testimony of a witness who suffered such a severe panic attack before the trial that he was consequently unable to travel. *Seelig*, 738 S.E.2d at 435. Similarly, the witness in *United States v. Benson* was "elderly and infirm" and the Sixth Circuit allowed her to testify via videoconferencing technology. 79 F. App'x 813, 820–21 (6th Cir. 2003).

Courts vary on whether the fact that a witness resides in a foreign country beyond the state's subpoena power is an adequate justification for remote testimony. Most seem to require some impediment to testifying beyond mere unwillingness to travel. In *Yates*, the witnesses lived in Australia and refused to come to the United States to testify. *See* 438 F.3d at 1310. The Eleventh Circuit did not find the state's interests in "expeditiously and justly resolving the case" and "providing the fact-finder with crucial evidence" enough to meet *Craig*'s necessity requirement. *Id.* at 1315–16. In contrast, the *Harrell* court did find adequate justification for remote testimony when the foreign witnesses were beyond the court's subpoena power and one was also ill. *See* 709 So. 2d at 1369–70. Similarly, in *Rosenau*, a Canadian court order had prevented the witness from entering the United States, and the federal district court approved of his testimony via videoconference. *See* 870 F. Supp. 2d at 1113.

There is also a general consensus among courts that mere convenience, efficiency, and cost-saving are not sufficiently important public necessities to justify depriving a defendant of face-to-face confrontation. In *Smith*, the trial court had permitted a state-employed lab analyst to testify via two-way video about the defendant's blood alcohol content at the time of his arrest. 308 P.3d at 136. The New Mexico Court of Appeals reversed, stating "that the witness's convenience or the convenience of his employer are not situations that demonstrate necessity" sufficient to overcome the Confrontation Clause's preference for face-to-face testimony. *Id.* at 138. Similarly, the Pennsylvania Superior Court held that an incarcerated witness could not be permitted to testify via two-way video merely because the state would have to arrange and pay for prisoner transport. *Atkinson*, 987 A.2d at 751. That

court stated that although video testimony might be logistically easier, "convenience and cost-saving are not sufficient reasons to deny constitutional rights." *Id.*

In this case, the State represented at the hearing on its motion that the witnesses who were involved in the car crash resided a significant distance from Iowa and had suffered serious injuries.[6] The State did not present evidence that the witnesses were beyond the court's subpoena power or that they were unable to travel because of their injuries. Under *Craig* and the other precedents discussed above, this is insufficient. The State has not shown that the witnesses cannot appear in person or even that personal appearance would cause severe stress.

Concerning the DCI lab employees, the State did not even argue that they resided out of state or had suffered injuries. Rather, the State's justification below was that their testimony was not "accusatory." On appeal, the State no longer advances that argument.[7] In effect, it simply maintains it would save time and money if these witnesses did not have to attend trial in person. The present situation is analogous to *Smith*, where the New Mexico Court of Appeals held a state lab analyst could not testify via two-way video simply because it was more convenient. In sum, the State's justifications of mere distance, cost, and efficiency are insufficient to overcome Rogerson's Sixth Amendment rights, and there is

---

[6]According to the State, one lived in New Orleans, Louisiana, one lived in Key West, Florida, and a third previously resided in West Virginia. They were visiting Iowa when the accident occurred.

[7]The United States Supreme Court has dispensed with the notion that some witnesses for the prosecution are exempt from the Confrontation Clause. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313–14, 129 S. Ct. 2527, 2533–34, 174 L. Ed. 2d 314, 323 (2009) ("Contrary to respondent's assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation."). The DCI employees in the present case are witnesses for the prosecution and are, therefore, subject to the Confrontation Clause.

no evidence the witnesses are unable to travel.  We therefore agree with Rogerson that the district court's order allowing the witnesses to testify by two-way teleconferencing should be reversed.

**IV.  Conclusion.**

For the foregoing reasons, we hold the standard set forth in *Maryland v. Craig* governs the constitutionality under the Sixth Amendment of two-way videoconferencing as a substitute for in-person testimony.  We further hold the State failed to meet the necessity prong of that standard.  Accordingly, we reverse the district court's order granting the State's motion for distance testimony and remand the case for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Hecht, J., who concurs specially.

**HECHT, Justice (concurring specially).**

This appeal presents two essential questions. First, did the State show exceptional circumstances supporting the district court's ruling that four of the State's witnesses could testify without being physically present in the courtroom (the "necessity question")? Second, if exceptional circumstances have been shown, did the State establish the technology it proposed to use would adequately protect Rogerson's right of confrontation (the "reliability question")? Although my colleagues suggest they decide only the necessity question in this case, their opinion expresses views about reliability with which I am not prepared to concur. I agree the State made no attempt to show necessity, and I agree the district court's order should be reversed for that reason. I write separately, however, because I do not share my colleagues' conclusion that current two-way video technology is inadequate and cannot accomplish the constitutional objectives of confrontation.

The text of the Sixth Amendment does not expressly require confrontation be achieved with testimony by witnesses who are physically present in the courtroom. U.S. Const. amend. VI. The drafters of the Sixth Amendment likely did not contemplate the possibilities presented by present-day technology; they were concerned principally with convictions by affidavit. *Mattox v. United States*, 156 U.S. 237, 242, 15 S. Ct. 337, 339, 39 L. Ed. 409, 411 (1895) ("The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of personal examination and cross-examination of the witness . . . ."). The notion witnesses should be physically present in the courtroom springs at least in part from courts' linguistic analysis of the word "confront."

*Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163, 111 L. Ed. 2d 666, 678 (1990) ("The word 'confront,' after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness."); *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2800, 101 L. Ed. 2d 857, 864 (1988) ("[T]he word 'confront' ultimately derives from the [Latin] prefix 'con-' (from 'contra' meaning 'against' or 'opposed') and the noun 'frons' (forehead)."); *California v. Green*, 399 U.S. 149, 175, 90 S. Ct. 1930, 1944, 26 L. Ed. 2d 489, 506 (1970) (Harlan, J., concurring) ("Simply as a matter of English the clause may be read to confer . . . a right to meet face to face all those who appear and give evidence at trial.").

Going beyond linguistics, the Supreme Court has concluded a defendant's Sixth Amendment right of confrontation does not establish an absolute requirement the accuser be physically present in the courtroom when testimony is presented in a criminal case. *Craig*, 497 U.S. at 853, 110 S. Ct. at 3167, 111 L. Ed. 2d at 683. The goal of confrontation—assuring "the reliability of evidence"—can be achieved without an accuser's physical presence in the courtroom if four conditions are met: (1) the accuser must testify under oath, (2) the defendant must have the opportunity to cross-examine the accuser, (3) the jury must be able to observe the demeanor of the accuser while testimony is given, and (4) the accuser must testify in the presence of the accused. *Id.* at 845–46, 110 S. Ct. at 3163, 111 L. Ed. 2d at 678. *Craig* established that a youthful accuser's presence can be accomplished under exceptional circumstances consistent with the Confrontation Clause through the use of closed-circuit technology permitting the defendant and fact finder(s) to observe the accuser during her testimony, but not permitting the accuser to see the defendant. *Id.* at 857, 110

S. Ct. at 3170, 111 L. Ed. 2d at 686. As my colleagues recognize, two-way video technology allows the witness and the defendant to see one another. Accordingly, the form of transmission the State proposed to use in this case is "very different from th[e closed-circuit system] used in . . . *Craig.*" *See Order of the Supreme Court*, 207 F.R.D. 89, 101 (2002) (advisory committee's note to proposed Fed. R. Crim. P. 26(b), reprinted as an appendix to the statement of Breyer, J.).

Whether a defendant's right of confrontation is adequately protected when witnesses testify via two-way video technology turns largely, in my view, on fact determinations. I believe that in this case, the question whether the sufficiency of the technology *could* have been shown should be left completely open. The answer to this question in a future case should be informed in part by the latest social science addressing the extent, if any, to which the actual physical presence of a witness in a courtroom produces a sufficiently enhanced opportunity for confrontation when compared to presence achieved through two-way video technology. Indeed, the answer to this fact question is essential, in my view, to a determination of whether the difference between actual and virtual presence supports the continued maintenance of a strict constitutional distinction.

I, of course, concede my colleagues' observation that virtual presence is not "the same" as physical presence. However, I believe social science should inform our answer to the question whether existing state-of-the-art technology can achieve the goal of confrontation through an accuser's virtual presence. If technology has evolved to the point where real-time video testimony neither significantly diminishes the fact finders' ability to assess credibility nor lessens accusers' motivation to tell the truth, courts should not cling to old forms for consistency's sake.

I acknowledge some scholars have suggested we simply do not know the answers to these questions. *See* Richard D. Friedman, *Remote Testimony*, 35 U. Mich. J.L. Reform 695, 702–03 (2002) ("I do not know of any extant studies that can give substantial comfort on [the effect of remote testimony]."); Nancy Gertner, *Videoconferencing: Learning Through Screens*, 12 Wm. & Mary Bill Rts. J. 769, 787 (2004) [hereinafter Gertner] (calling "for more studies of [videoconferencing's] significance in enabling jurors to evaluate testimony"); Fredric I. Lederer, *The Road to the Virtual Courtroom? A Consideration of Today's—and Tomorrow's—High-Technology Courtrooms*, 50 S.C. L. Rev. 799, 820 (1999) [hereinafter Lederer] ("[W]e lack any experimental evidence that might indicate whether remote witnesses are more or less likely to tell the truth than in-court witnesses."); Marc Chase McAllister, *Two-Way Video Trial Testimony and the Confrontation Clause: Fashioning a Better* Craig *Test in Light of* Crawford, 34 Fla. St. U. L. Rev. 835, 875 (2007) [hereinafter McAllister] ("[T]he precise effects of virtual confrontation are still unknown."). Yet, years have passed since those scholars weighed in. The advance of technology continues. More recent social science scholarship bearing on the subject could inform a future decision on these important questions.

My colleagues posit that the "social pressure to tell the truth can be diminished when the witness is far away rather than physically present with the defendant in the courtroom," and assert "the screen and the physical distance between the [witness and the defendant] tend to reduce the truth-inducing effect of the confrontation." These intuitive assumptions bearing on the assessment of reliability may be true, but maybe not. Jeremy A. Blumenthal, *A Wipe of the Hands, a Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility,*

72 Neb. L. Rev. 1157, 1173–74 (1993) (asserting the profound effect of confrontation and the difficulty of lying to someone's face are "accepted, but unfounded" premises). More importantly, however, the majority's statement of these assumptions suggests—at least implicitly—that my colleagues are addressing more than the necessity question in this case.

I do not presume my colleagues' assumptions are true or false. I would prefer instead to determine such matters based upon a record revealing the fullness of witnesses', defendants', and fact finders' perceptions permitted by two-way technology utilized or proposed for use in a particular case. Assumptions supporting the requirement of witnesses' physical presence in the courtroom—and eschewing evidence presented via two-way video technology—should be tested against expert opinions from the social sciences on the question whether the purposes of confrontation are in fact significantly advanced by physical presence.[8]

Courts have persisted in viewing witnesses' physical presence as a core feature of confrontation, but they have offered little more than intuition in support. *See, e.g., Craig,* 497 U.S. at 846, 110 S. Ct. at 3164, 111 L. Ed. 2d at 679 ("[F]ace-to-face confrontation . . . reduc[es] the risk that a witness will wrongfully implicate an innocent person."); *Coy,* 487 U.S. at 1019, 108 S. Ct. at 2802, 101 L. Ed. 2d at 866 ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' "); *United States v. Bordeaux,* 400 F.3d 548, 554 (8th Cir. 2005) (relying on "intangible elements" in concluding both that two-way confrontation "is not constitutionally equivalent to a face-to-face

---

[8]Some studies suggest that, "as a general rule, people are poor human lie detectors"—perhaps no matter the medium. Gertner, 12 Wm. & Mary Bill Rts. J. at 785 n.93 (collecting studies); *see also* Lederer, 50 S.C. L. Rev. at 820 ("Four experiments have indicated that jurors perceive remote witnesses just as they perceive in-court witnesses, neither better nor worse.").

confrontation" and that two-way systems "fall short").  I would prefer to have evidence bearing upon several questions before deciding whether virtual presence can satisfy—beyond the limited circumstances present in *Craig*—the essential purposes of the confrontation right.   Does available technology permit the witness and the defendant a sufficient view of each other to achieve the purposes of face-to-face confrontation? Does available technology allow fact finders a sufficient opportunity to hear and see the witness in assessing credibility?[9]  Do witnesses sworn to tell the truth really tend to feel a greater motivation for honesty when they are physically present in the courtroom with the defendant than when they are able to see and experience the defendant's presence on a monitor as they testify via two-way video technology?  To what extent do the "trappings" or symbols of the courtroom tend to emphasize the solemnity of judicial proceedings and increase the likelihood that witnesses will tell the truth when they testify in person?   If—as we sometimes assume—there is a correlation between the factors emphasizing the solemnity of the proceedings and witnesses' motivation toward honesty, should we really believe those factors cannot be effectively communicated to witnesses through currently available two-way video technology?

The State provided no evidence in this case illuminating the court's answers to these questions.  Accordingly, I associate myself—for now—with my colleagues' conclusion that "[r]emote testimony of any kind

---

[9]Some have posited that a monitor "necessarily limits the jurors' ability to see the witness's body."  Gertner, 12 Wm. & Mary Bill Rts. J. at 786.  While this ability is an important aspect of determining credibility because body language may be less controllable than facial expressions and therefore deemed an indicator of possible deception, *see id.*, I leave room for the possibility the court could consider camera angles and capacity in deciding the adequacy of confrontation permitted by two-way video technology.

should not be lightly substituted" in place of live testimony by witnesses physically present in the courtroom. However, I would not assume or decide without more evidence that effective confrontation cannot be provided in criminal cases through currently available two-way video technology.[10]

Courts must maintain their relevance over time by utilizing emerging technologies consistent with constitutional purposes, rather than steadfastly adhering to the way it used to be. *See Harrell v. State*, 709 So. 2d 1364, 1372 (Fla. 1998) ("[C]ourtrooms . . . cannot sit idly by, in a cocoon of yesteryear, while society and technology race [forward]."). Although courts have interpreted the Confrontation Clause as requiring in-person testimony except in exceptional circumstances, this interpretation was developed long before technology allowed excellent two-way video transmission. Similarly, although my colleagues allow for the possibility that virtual presence will someday be sufficient for purposes of the Confrontation Clause, they conclude "we are not there yet." Lacking sufficient information, I am not prepared to join in that conclusion today.

I agree the State did not prove necessity, so the district court's order must be reversed. However, I would allow for the possibility that, with current technology and reasonable precautions employed by counsel and carefully enforced by courts, virtual presence might permit constitutionally sufficient confrontation.

---

[10]I believe the proposed (but rejected) Federal Rule of Criminal Procedure 26(b) had attractive features. *See Order of the Supreme Court*, 207 F.R.D. at 99–104. It would have required a showing of necessity as a condition of presenting testimony through two-way video. *See id.* at 99 (allowing video testimony only if "the requesting party establishes exceptional circumstances"). Upon a showing of necessity, the court would assess the adequacy of the proposed technology and impose any procedural precautions it deems appropriate. *Id.* (requiring "appropriate safeguards"); *see also* McAllister, 34 Fla. St. U. L. Rev. at 870–71 (proposing a test for permitting two-way video testimony that includes safeguards and technical requirements).