REL: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

_____

## CR-21-0361

_____

## Cody Bragg

## v.

## State of Alabama

## Appeal from Sumter Circuit Court
## (CC-17-57)

KELLUM, Judge.

The appellant, Cody Bragg, was convicted of robbery in the first degree, a violation of § 13A-8-4(a)(1), Ala. Code 1975, and carrying a pistol without a license, a violation of § 13A-11-73, Ala. Code 1975. He was sentenced to concurrent terms of 20 years in prison for the robbery

conviction and to 1 year for the carrying-a-pistol-without-a-license conviction.

The State's evidence tended to show that Arnaud Laporte-Leleu, a fighter pilot in the French Navy, was undergoing fighter-pilot training in February 201 at a naval base in Meridian, Mississippi. Laporte-Leleu owned a 2014 Mustang vehicle. Laporte-Leleu testified that at the conclusion of his training he listed the vehicle for sale on Craig's List, an internet market-place, for $15,000. Bragg, he said, texted him and said that he was interested in purchasing the vehicle. Bragg came to Laporte-Leleu's house and drove the vehicle. The next morning, Bragg returned to look at the vehicle a second time and told Laporte-Leleu that he wanted to purchase the vehicle. When filling out the title, Laporte-Leleu said, he made a mistake, so he and Bragg agreed to meet at the courthouse to get a duplicate title. While they were at the courthouse, Bragg took the title, and Laporte-Leleu said that he did not see that title again. The two traveled from Mississippi to the Bank of York in York, Alabama, so that Bragg could get the money for the vehicle. Bragg could not get the money at the bank, Laporte-Leleu said, because Bragg told him that he did not have his credit card. (R. 58.) Laporte-Leleu's

roommate, Antoine Gaffet, was following them in another vehicle. Bragg had them go to his father's house and various other places in York and Cuba, Alabama, to try and get the money for the vehicle. At one point, Laporte-Leleu said, Bragg told him that there was trouble with the engine so Bragg, who was driving the vehicle, stopped the Mustang.

> "[Laporte-Leleu]: We opened the hood. There was nothing. We closed the hood. And at this time, I remember like Cody Bragg look at me very -- it was a cold look, very cold look, and then we come back on the car. And the way we sit down at this time, so he was in the driving place. I was in the passenger place. He put the gun on me, and he said, 'Leave the car. It's mine.'

> "At this time, I attempted to put the gun out. I attempted to put him out of the car, and I attempted to put him on the ground without hurting him. …

> "At this time, I call my friend Antoine Gaffet was still -- he was waiting on us, I think, at the bank, if I remember well. And at this time, he came and put the gun out of the hands of Cody Bragg. Pulled out the magazine. We can see all the bullets in the magazine and put everything in his car, the gun in one part of the car and the magazine in another part. …

> "At this time, I call everybody in the French -- I call my boss, U.S. and French boss. And Antoine attempted to stop someone in the road to help us and to call police for them to come very quickly.

> "And at this time, there is another person coming from house on the hood, [sic], and they put the gun on us as well, big guns, and put us on the ground just to stabilize the situation. And we were waiting for the police to come. …"

3

(R. 60-62.) Police discovered the title for the vehicle inside Bragg's pants. It appeared that Bragg had forged Laporte-Leleu's name on the title.

I.

Bragg argues that the circuit court erred in allowing two witnesses, Laporte-Leleu and Gaffet, to testify via two-way-video link or Zoom video teleconferencing because, he says, doing so violated his right to confront his accusers. He asserts that the text of the Sixth Amendment to the United States Constitution contains no exception to a defendant's right to confront his accusers. The State argues that the circuit court's ruling was proper according to the Florida Supreme Court's holding in Harrell v. State, 709 So. 2d 1364 (Fla. 1998).

The record shows that in October 2021, the State moved that the circuit court allow two witnesses to testify via two-way video link. The State asserted that the victim, Laporte-Leleu, and another witness, Antoine Gaffet, were both active-duty fighter pilots in the French Navy and would not be able to appear in person to testify in the foreseeable future. (C. 133-34.) Bragg objected. (C. 141.) The State filed an extensive response to Bragg's objection. (Supp. C. 2-10.) In this response, the State asserted, in part:

"The two witnesses, Mr. Arnaud Laporte-Leleu and Mr. Antoine Gaffet permanently reside in France and are beyond the subpoena power of the court. The testimony of the two French witnesses is absolutely essential to this case. Mr. Laporte-Leleu is the sole victim of [Bragg's] attack and Mr. Gaffet is the only other non-party witness to the incident. The State cannot compel the presence and testimony of these individuals. Additionally, the two witnesses are constantly assigned to active-duty military missions with the French Navy placing them on carrier ships and military planes for months at a time. They cannot disobey the ordered assignments for the extended period of time necessary to testify in person nor do they wish to neglect their duties of serving their country. Without the testimony of Mr. Arnaud Laporte-Leleu and Mr. Antoine Gaffet, the State cannot prosecute this case. The State further submits that the violent offense of armed robbery is not an action that should be unpunished in Sumter County simply because [Bragg] criminalized a foreign victim who is permanently out of the country. For these reasons combined, allowing the witnesses to testify by way of Zoom is absolutely imperative to the State's interest in the expeditious and just resolution of violent offense pending in the state court system.

"The State further submits an additional factor for consideration: accommodating the military service of the French Navy witnesses who are on active-duty assignment and unable to travel to the United States to testify. The Alabama Armed Services Accommodation Act recognizes such an exception to the Confrontation Clause and allows video testimony by active-duty U.S. Military officers. …"

(Supp. C. 5-6.) A hearing was held on the motion. At the hearing, the prosecutor discussed the reasons why the motion should be granted and responded to Bragg's arguments made in his objection to the motion. The

5

circuit court granted the State's motion "on the authority of <u>Maryland v. Craig</u>, 497 U.S. 836 (1990)." (C. 157.)

"The Confrontation Clause [of the Sixth Amendment of the United States Constitution] provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51 (1987). Likewise, the Alabama Constitution provides that "in all criminal prosecutions, the accused has a right … to be confronted by the witnesses against him." Ala. Const. Art. I, § 6.

The United States Supreme Court in <u>Maryland v. Craig</u>, 497 U.S. 836 (1990), recognized that the right of confrontation is not "absolute" and that that right "must occasionally give way to considerations of public policy and the necessities of the case." 497 U.S. at 849. The <u>Craig</u> Court stated:

> "[O]ur precedents establish that 'the Confrontation Clause reflects a preference for face-to-face confrontation at trial,' [<u>Ohio v.</u>] <u>Roberts</u>, 448 U.S. [56], at 63, 100 S.Ct. [2531], at 2537 [(1980)] (emphasis added; footnote omitted), a preference that 'must occasionally give way to considerations of public policy and the necessities of the case,' <u>Mattox [v. United States]</u>, 156 U.S. [237], at 243, 15 S.Ct. [337], at 339-340 [(1895)]. '[W]e have attempted to harmonize the goal of the Clause -- placing limits on the kind of evidence that may be received against a defendant -- with a societal interest in

accurate factfinding, which may require consideration of out-of-court statements.' Bourjaily [v. United States], 483 U.S. [171], at 182, 107 S.Ct. [2775], at 2782 [(1987)]. We have accordingly interpreted the Confrontation Clause in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process. See, e.g., Kirby [v. United States], 174 U.S. [47], at 61, 19 S.Ct.[574], at 578 [(1899)] ('It is scarcely necessary to say that to the rule that an accused is entitled to be confronted with witnesses against him the admission of dying declarations is an exception which arises from the necessity of the case'); Chambers [v. Mississippi], 410 U.S. [284], at 295, 93 S.Ct. [1038], at 1045 [(1973)] ('Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process'). Thus, though we reaffirm the importance of face-to-face confrontation with witnesses appearing at trial, we cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers. Indeed, one commentator has noted that '[i]t is all but universally assumed that there are circumstances that excuse compliance with the right of confrontation.' Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 107–108 (1972)."

497 U.S. at 850.

Alabama has not had occasion to address whether testimony via a two-way live video link violates the Confrontation Clause. The majority of courts that have addressed this issue have analyzed this issue using

the test articulated in <u>Maryland v. Craig</u>.[1]   The United States Court of Appeals for the Eleventh Circuit, a circuit that includes Alabama, has "acknowledge[d] that <u>Craig</u> supplies the proper test for admissibility of two-way video conference testimony." <u>United States v. Yates</u>, 438 F.3d 1307, 1313 (11th Cir. 2006).

As stated above, the State relies on the Florida Supreme Court case of <u>Harrell v. State</u>, supra, to support the court's ruling in this case.  In <u>Harrell</u>, two victims, whose residence was in Argentina, were robbed while on vacation in Florida.  The State moved that the couple be allowed to testify via satellite transmission because of the distance and the health problems of one of the witnesses.  The court granted the State's motion, and Harrell was convicted of robbery.  On appeal, Harrell argued that his right to confront his accusers was violated.  In upholding the trial court's ruling, the Supreme Court of Florida adopted the analysis used by the United States Supreme Court in <u>Craig</u>.   The court found that public-

---

[1]Our research revealed that the United States Court of Appeals for the Second Circuit in <u>United States v. Gigante</u>, 166 F.3d 75 (2d Cir. 1999), used an "exceptional-circumstances" test to evaluate this issue. The basis for that court's holding was that the testimony in <u>Gigante</u> was via two-way video technology and the testimony in <u>Craig</u> was one-way video.  It held that the two-way technology "preserved the face-to-face confrontation." <u>Gigante</u>, 166 F.3d at 81.

policy considerations justified remote testimony because the witnesses were beyond the subpoena power of the court; it was "clearly in our state's interest to expeditiously and justly resolve criminal matters that are pending in the state court system"; one of the witnesses was in poor health and could not travel to the U.S.; and the two witnesses were essential to the case. Harrell, 709 So. 2d at 1369-70.

We agree that the proper analysis begins with the United States Supreme Court's test in Maryland v. Craig. The Arizona Court of Appeals in State ex rel. Montgomery v. Kemp, 239 Ariz. 332, 371 P.3d 660 (Ariz. Ct. App. 2016), discussed Craig and subsequent decisions addressing that holding.

> "While recognizing the Constitution's preference for face-to-face confrontation, however, the Supreme Court has clarified that the right to face-to-face confrontation is not absolute. [Maryland v.] Craig[, 497 U.S. 836 (1990),] set forth a test for abridging the preference for face-to-face confrontation with video testimony: the State must show that (1) the denial of face-to-face confrontation is necessary to further an important public policy; (2) the reliability of the testimony is otherwise assured; and (3) there is a case-specific showing of necessity for the accommodation. Id. at 850, 110 S.Ct. 3157. Although Davis notes that Craig involved one-way closed-circuit television and child witnesses, including the alleged victim, who could not see or hear the defendant, nothing in its holding suggests its application is limited to such cases. See People v. Wrotten, 14 N.Y.3d 33, 896 N.Y.S.2d 711, 923 N.E.2d 1099, 1103 (2009) ('Nowhere does Craig

9

suggest that it is limited to child witnesses or that a "public policy" basis for finding necessity must be codified. Indeed, federal courts have permitted live video testimony in a variety of circumstances, including instances where public policy is implicated by a key witness too ill to appear in court....' (citing Horn v. Quarterman, 508 F.3d 306, 317-18 (5th Cir. 2007); United States v. Benson, 79 Fed. Appx. 813, 820-21 (6th Cir. 2003); United States v. Gigante, 166 F.3d 75, 79 (2d Cir. 1999))).

"Since deciding Craig, the Supreme Court has not further examined the constitutionality of remote video testimony or considered new types of technology available to facilitate remote testimony, such as the two-way video conferencing the State seeks to use in this case that would allow E.P. and Davis to hear and see one another simultaneously. See State v. Rogerson, 855 N.W.2d 495, 499-500 (Iowa 2014); see also Wrotten v. New York, 560 U.S. 959, 959, 130 S.Ct. 2520, 177 L.Ed.2d 316 (2010) (Sotomayor, J., respecting denial of petition for writ of certiorari) (noting that the question of and standards for the use of two-way video testimony in a petitioner's trial 'is not obviously answered by Maryland v. Craig'). Moreover, no Arizona opinion has addressed the question of allowing adult witnesses to testify using two-way video technology.

"Numerous federal and state courts have extended Craig to the use of two-way video testimony for adult witnesses. See, e.g., United States v. Yates, 438 F.3d 1307, 1313 (11th Cir. 2006) (acknowledging Craig as the proper test for the admissibility of two-way video conference testimony and noting agreement with the Sixth, Eighth, Ninth, and Tenth Circuits); Rogerson, 855 N.W.2d at 506-07 (Iowa Supreme Court approving the use of two-way video testimony for adult witnesses, provided the Craig factors are met); White v. State, 223 Md. App. 353, 116 A.3d 520, 540-49 (Md. Ct. Spec. App. 2015) (applying Craig to allow a witness in a cold case to testify by two-way video because it would be 'cruel and

unnecessary to require her to fly' given her health concerns); People v. Buie, 285 Mich. App. 401, 775 N.W.2d 817, 825 (2009) (applying Craig to two-way video testimony, '[l]ike the majority of federal courts that have examined this issue'); City of Missoula v. Duane, 380 Mont. 290, 355 P.3d 729, 734 (2015) (applying Craig to allow the two-way video testimony of a doctor whose testimony in three trials would cause a prohibitive expense to the city and place a significant burden on the doctor); Commonwealth v. Atkinson, 987 A.2d 743, 750-51, ¶¶ 16-17 (Pa. Super. Ct. 2009) (applying Craig and concluding that the defendant's right to confrontation had been violated because expediting disposition of the case was an insufficient reason for allowing the use of two-way video testimony); Bush v. State, 193 P.3d 203, 215-16, ¶¶ 52–53 (Wyo. 2008) (applying Craig to allow a witness's testimony via two-way video 'to further the important public policy of preventing further harm to his already serious medical condition')."

239 Ariz. at 335-36, 371 P.3d at 663-64. See also Rivera v. State, 381 S.W.3d 710, 713 (Tex. App. 2012) ("We conclude that under the circumstances, the preference for having witnesses testify in the courtroom must give way to the practical considerations involving Taylor's military obligation that made his physical presence impractical. The procedure the trial court followed, allowing Taylor to participate in the trial by live videoconference while in full view of those participating in the courtroom, did not violate Rivera's rights under the Confrontation Clause of the Sixth Amendment. See U.S. Const. amend. VI.").

11

Thus, this Court will consider whether the use of two-way video testimony was necessary to further an important public policy or necessity and whether the witnesses' testimony was reliable. Maryland v. Craig, 497 U.S. at 850.

Public Policy/Necessity. "There is … a general consensus among courts that mere convenience, efficiency, and cost-saving are not sufficiently important public necessities to justify depriving a defendant of face-to-face confrontation." State v. Rogerson, 855 N.W.2d 495, 507 (Iowa 2014). "Illness has been [a] justification that courts have found sufficient to satisfy the Craig 'necessity' prong." Rogerson, 855 N.W.2d at 506; Harrell v. State, 709 So. 2d at 1370. The Texas Court of Appeals in Rivera v. State, supra, held that a witness's military service was also a sufficient necessity to warrant two-way video testimony.

In 2015, the Alabama Legislature passed "The Alabama Armed Services Accommodation Act" codified at § 12-21-135.1, Ala. Code 1975. This Act provides, in part:

> "(b) The Legislature finds it to be an important matter of public policy that an accommodation be made for military members who are asked to testify in civil or criminal trials in this state but are unable to attend in person. The purpose of this section is to ease the burdens on military personnel and their families brought on by the duty of appearing as a

12

witness in a trial in this state when summoned. The purpose of this section is also to allow members of the armed services to assist in trials in this state as witnesses without interrupting their military service, while protecting the rights of all parties in civil or criminal litigation. The purpose of this section is also to better enable the fact-finder to obtain crucial evidence and will aid in the expeditious resolution of cases in this state by providing a procedure in which testimony of a person serving in the armed services may be taken without undue hardship.)"

Based on the wording of the above statute, Alabama has recognized the important public policy in making accommodation for active-duty military personnel who are witnesses in an Alabama court.

In this case, the two witnesses were active-duty fighter pilots in the French Navy. Laporte-Leleu and Gaffet both testified that they were currently stationed at an air station in France and were also on the Aircraft Carrier Charles de Gaulle. They were thus outside the subpoena power of the State. One of the witnesses was the victim and the other was an eye witness to the events. The testimony of the two witnesses was necessary for the State's prosecution of Bragg, and their active-duty military service made it extremely difficult to travel to Alabama to testify. This prong of the Craig test was satisfied.

Reliability.

> "The reliability portion of [the] test [in <u>Maryland v.</u> <u>Craig</u>, 497 U.S. 836 (1990)] is met by a 'combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' <u>Craig</u>, 497 U.S. at 846, 110 S.Ct. 3157. Because the <u>Craig</u> Court stated the combination of oath, cross-examination, and observation of a witness's demeanor 'adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony,' the reliability portion of <u>Craig's</u> test is generally not discussed in detail by courts. <u>Id</u>. at 851, 110 S.Ct. 3157."

<u>State v. Smith</u>, 636 S.W.3d 576, 583 (Mo. 2022).

The record shows that before the two witnesses testified via two-way video, they were given an oath. The following is contained in the record:

> "[T]he oath is being administered by Honorable Consulate of the United States assigned to Paris, France by J. Etprng pursuant to the 1998 United States France Mutual Legal Assistance Treaty.[2] This was approved by or facilitated by Justice Attache Andrew Finkleman of the Department of Justice in the United States Embassy in Paris, France."

---

[2]The Mutual Legal Assistance in Criminal Matters is a Treaty between the United States and France that was signed in Paris on December 10, 1998. "The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: obtaining the testimony or statements of person. ..." Article 8(4) of the Treaty further provides that if a person gives false testimony they are subject to prosecution. "[A]n oath is only effective if the witness can be subjected to prosecution for perjury upon making a knowingly false statement." <u>Harrell v. State</u>, 709 So. 2d at 1371.

14

(R. 42.) The witnesses were subject to cross-examination. In fact, the cross-examination of Laporte-Leleu was extensive. (R. 70-92.) The two witnesses were also in view of the jury, and the defendant was able to see and hear both witnesses. Nothing in the record suggests that problems were encountered in the two-way video during the witnesses' testimony. Thus, this prong of the Craig test was also satisfied.

For the above reasons, we find that the two factors in Craig were satisfied and that the two-way video testimony of the two active-duty military witnesses did not violate Bragg's right to confront his accusers. Therefore, Bragg is due no relief on this claim.

## II.

Bragg also argues that the circuit court erred by allowing the admission of evidence in violation of the Alabama Rules of Evidence at the hearing on the State's motion for two-way video testimony. Specifically, he argues that the prosecutor was allowed to explain to the court why the victim should be allowed to testify via two-way video, but he had no opportunity to cross-examine the prosecutor's statements to the court.

Initially, we question whether the Alabama Rules of Evidence apply to a pretrial hearing. Rule 1101(b), Ala. R. Evid, addresses those situations where the Rules of Evidence do not apply:

"Rules Inapplicable. These rules, other than those with respect to privileges, do not apply in the following situations:

"(1) Preliminary Questions of Fact. The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.

"(2) Grand Jury. Proceedings before grand juries.

"(3) Miscellaneous Proceedings. Proceedings for extradition or rendition; preliminary hearings in criminal cases; sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.

"(4) Contempt Proceedings. Contempt proceedings in which the court may act summarily."

Rule 104, Ala. R. Evid., states, in part:

"(a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

Second, the State argues that the United States Supreme Court in Pennsylvania v. Ritchie, 480 U.S. 39 (1987), recognized that the right to confrontation is a trial right. Many courts have held that the right to confrontation does not extend to pretrial hearings. See State v. Zamzow, 374 Wis. 2d 220, 242, 892 N.W.2d 637, 649 (2017) ("The right to confrontation arose at common law as a tool to test witness reliability at trial. With the advent of pretrial evidentiary hearings during the twentieth century, the Supreme Court has signaled that the right to confrontation persists as a trial protection and does not apply during pretrial proceedings."); State v. Timmerman, 218 P. 3d 590, 593 (Utah 2009) ("[The] holding [in Crawford v. Washington, 541 U.S. 36 (2004),] does not extend to preliminary hearings in state proceedings."); State v. Daly, 278 Neb. 903, 924, 775 N.W.2d 47, 66 (2009) ("[I]t is well established that Confrontation Clause rights are trial rights that do not extend to pretrial hearings in state proceedings."); Vanmeter v. State, 165 S.W.3d 68-74-75 (Tex. App. 2005) ("In summary, we conclude that Crawford did not change prior law that the constitutional right of confrontation is a trial right, not a pretrial right which would transform it into a 'constitutionally compelled rule of discovery.'").

Furthermore, if any error occurred that error was harmless beyond a reasonable doubt. See <u>Delaware v. Van Arsdall</u>, 475 U.S. 673 (1986). The questions that Bragg posed during the pretrial hearing that he says he was not allowed to ask the prosecutor were questions that Bragg asked Laporte-Leleu during his cross-examination.[3] Specifically, counsel questioned Laporte-Leleu extensively about his ability to travel to the United States to testify. Laporte-Leleu's answers were consistent with the statements made by the prosecutor at the hearing on the motion and in the prosecutor's lengthy written response to Bragg's objection to the remote testimony. Thus, if any error occurred, that error was harmless.

For the foregoing reasons, we affirm Bragg's convictions for robbery and for carrying a pistol without a license.

AFFIRMED.

Windom, P.J., and McCool, J., concur. Cole, J., concurs in the result. Minor, J., dissents, with opinion.

---

[3]Bragg also argued at the hearing that the circuit court should have placed the prosecutor under oath. "Ultimately, 'attorneys are officers of the court and "when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath."'" <u>State v. Miller</u>, 975 N.W.2d 807, 814 (Iowa 2022), quoting <u>Holloway v. Arkansas</u>, 435 U.S. 475, 486 (1978).

MINOR, Judge, dissenting.

The Constitution protects actual rights, not virtual ones.[4] Our founding charters—the United States Constitution[5] and the Alabama Constitution[6]—protect the ancient right to confront one's accusers in open court face-to-face and in person.[7] A jury convicted Cody Bragg based on evidence from two witnesses who testified, not in person in the Sumter County courthouse where Bragg was tried, but remotely by video from a courtroom in France. "The simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation,"[8]

---

[4]See Order of the Supreme Court, 207 F.R.D. 89, 94 (2002) (statement of Scalia, J.) ("Virtual confrontation might be sufficient to protect virtual constitutional rights; I doubt whether it is sufficient to protect real ones.").

[5]U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...").

[6]Art. I, § 6, Ala. Const. 2022 ("[I]n all criminal prosecutions, the accused has a right … to be confronted by the witnesses against him …").

[7]See Ex parte Rodriguez, [No. SC-2022-0845, Jan. 21, 2023] ___ So. 3d ___, ___ (Ala. 2023) (Parker, C.J., dissenting) (noting that "[t]he common-law right to confront one's accusers face to face goes back to the Roman Empire and ancient Israel" and discussing the protection of the right to confrontation in the common law and in the founding of America).

[8]United States v. Yates, 438 F.3d 1307, 1315 (11th Cir. 2006).

and, understandably, Bragg objected repeatedly to the trial court's permitting the witnesses to testify via video. This Court holds that the testimony by video did not violate Bragg's right to confront his accusers. I respectfully dissent.

Bragg was arrested and charged with the offenses in March 2017. The two main witnesses at trial were the alleged victim, Arnaud Laporte-Leleu, and his roommate, Antoine Gaffet. Laporte-Leleu and Gaffet were members of the French military who were temporarily in the United States for training. They remained in the United States until at least June 2017. More than four years later, the State moved the trial court to allow Laporte-Leleu and Gaffet to testify against Bragg remotely via a two-way video. In response to Bragg's objections, the State asserted that the witnesses lived in France, that they were beyond the subpoena power of the trial court, and that their testimony was "absolutely essential to this case."

At the hearing on the State's motion, the State offered only representations by the prosecutor in support of the motion, including that the witnesses allegedly were out of the United States within a month of the offense and that "[t]here's no question [the witnesses] can't come

20

back" to the United States. The State also cited the Alabama Armed Services Accommodation Act, § 12-21-135.1, Ala. Code 1975, in support of its motion, although the State conceded that § 12-21-135.1 applies only to members of the United States military. See § 12-21-135.1(d)(2), Ala. Code 1975 (defining "armed services" as "[t]he federal military forces of the United States including the Army, Navy, Marine Corps, Air Force, Coast Guard, a reserve component thereof, and the National Guard"). Bragg pointed out that § 12-21-135.1 allows testimony by video in a criminal case only if both parties consent. § 12-21-135.1(f), Ala. Code 1975. Bragg also asserted that the State had made no effort to depose the witnesses before they left the United States. See Rule 16.6, Ala. R. Crim. P. After the hearing, the circuit court granted the State's motion, stating, with no elaboration, that it granted the motion "on the authority of Maryland v. Craig, 497 U.S. 836 (1990)."

On appeal, Bragg asserts that (1) the trial court had no evidence to support its pretrial decision to allow the witnesses to testify by video and (2) that the testimony by video violated his right to confront his accusers. In support, Bragg cites, among other authorities, United States v. Yates, 438 F.3d 1307 (11th Cir. 2006).

21

In <u>Yates</u>, the United States Circuit Court of Appeals for the Eleventh Circuit held that "witness testimony presented on a television monitor at a criminal trial in Montgomery, Alabama, by live, two-way video conference with witnesses in Australia, violated the Defendants' Sixth Amendment right to confront the witnesses against them." 438 F.3d at 1309. After noting that the federal circuit courts of appeals disagreed over whether <u>Maryland v. Craig</u>, 497 U.S. 836 (1990), provides the proper test for admissibility of two-way video conference testimony, the court evaluated the claim under Eleventh Circuit precedent applying <u>Craig</u>:

> "Because Defendants were denied a physical face-to-face confrontation with the witnesses against them at trial, we must ask whether the requirements of the <u>Craig</u> rule were satisfied, justifying an exception to the physical face-to-face confrontation requirement of the Sixth Amendment. As indicated earlier, under <u>Craig</u>, such testimony may be offered 'only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' 497 U.S. at 850, 110 S. Ct. at 3166.

> "We reject the Government's argument that <u>Craig</u> does not apply because two-way video conference testimony is necessarily more protective of defendants' confrontation rights than the method of admitting testimony of an unavailable witness prescribed by Rule 15.5 First, the Government's argument ignores the fact that Rule 15 gives

the defendant the opportunity to be present at the deposition and thus an opportunity for physical face-to-face confrontation. Second, the Government concedes that the procedure used in this case is not authorized by the Federal Rules of Criminal Procedure. Rather, the Government argues, admission of video testimony is within the inherent powers of trial courts. But history demonstrates otherwise. In 2002, the Advisory Committee on the Criminal Rules suggested a revision to Federal Rule of Criminal Procedure 26 that would have allowed testimony by means of two-way video conferencing. Thereafter, the Supreme Court transmitted to Congress proposed amendments to the Federal Rules of Criminal Procedure. The Court declined to transmit the proposed revision to Rule 26 that would have allowed testimony by two-way video conference. Justice Scalia filed a statement explaining that he shared 'the majority's view that the Judicial Conference's proposed Fed. Rule Crim. Proc. 26(b) is of dubious validity under the Confrontation Clause of the Sixth Amendment to the United States Constitution ....' Order of the Supreme Court, 207 F.R.D. 89, 93 (2002). He remarked that the proposed amendments were 'contrary to the rule enunciated in Craig in that they would not limit the use of remote testimony to 'instances where there has been a "case-specific finding" that it is "necessary to further an important public policy."' Id. (citation omitted). Rule 26 was not revised to allow such testimony.

"Thus, to accept the Government's reasoning on this point, we would need to accept its implicit claim that it knows best how to protect defendants' confrontation rights. We do not accept this claim. To do so would require that we disregard the history of the proposed amendments to Rule 26. Further, to accept the Government's claim, we would have to ignore the carefully-crafted provisions of Rule 15 that were designed to protect defendants' rights to physical face-to-face

23

confrontation and instead approve a procedure not contemplated by the Federal Rules of Criminal Procedure.

"The simple truth is that confrontation through a video monitor is not the same as physical face-to-face confrontation. As our sister circuits have recognized, the two are not constitutionally equivalent. See, e.g., United States v. Bordeaux, 400 F.3d 548, 554-55 (8th Cir. 2005). The Sixth Amendment's guarantee of the right to confront one's accuser is most certainly compromised when the confrontation occurs through an electronic medium. Indeed, no court that has considered the question has found otherwise; even the Gigante court acknowledged that, 'the use of remote, closed-circuit television testimony must be carefully circumscribed.' United States v. Gigante, 166 F.3d 75, 80 (2d Cir. 1999).

"As stated above, where a defendant's right to confront a witness against him will be affected, the determination of whether a particular case requires a departure from usual procedures must be made, by the trial court, on a case-by-case basis. Craig, 497 U.S. at 854, 110 S. Ct. at 3169. The court generally must: (1) hold an evidentiary hearing and (2) find: (a) that the denial of physical, face-to-face confrontation at trial is necessary to further an important public policy and (b) that the reliability of the testimony is otherwise assured. Id. at 850, 855, 110 S. Ct. at 3166, 3169. The first part of this test requires that the trial court find that it is essential to deny the defendant his right to face-to-face physical confrontation in order to serve the interest the government asserts. See, id. at 855, 110 S. Ct. at 3169 (stating that, in order to separate the witness and defendant, the problem must be the physical presence of the defendant during the witness's testimony, not some other problem that could be remedied by a less intrusive solution).

24

"In this case, the district court applied the <u>Craig</u> test to permit the Australian witnesses to testify by two-way video conference broadcast on a television monitor at the trial convened in the United States Attorney's Office in Montgomery, Alabama. … However, it held no hearing to consider evidence of the necessity for the video conference testimony. Rather, the trial court allowed the two-way video testimony based only on the Government's assertions in its motion that the Australian witnesses were unwilling to travel to the United States for trial, … and the Government's posited 'important public polic[ies] of providing the fact-finder with crucial evidence,' … 'expeditiously and justly resolving the case,' … and 'ensuring that foreign witnesses can so testify.' … The district court considered sufficient the Government's stated 'important public policy of providing the fact-finder with crucial evidence,' … and 'interest in expeditiously and justly resolving the case.' … We accept the district court's statement that the witnesses were necessary to the prosecution's case on at least some of the charges, as the record supports the Government's assertion that the testimony was crucial to a successful prosecution of the Defendants and aided expeditious resolution of the case. The Government's interest in presenting the fact-finder with crucial evidence is, of course, an important public policy. We hold, however, that, under the circumstances of this case (which include the availability of a Rule 15 deposition), the prosecutor's need for the video conference testimony to make a case and to expeditiously resolve it are not the type of public policies that are important enough to outweigh the Defendants' rights to confront their accusers face-to-face.

"The district court made no case-specific findings of fact that would support a conclusion that this case is different from any other criminal prosecution in which the Government would find it convenient to present testimony by two-way

video conference. All criminal prosecutions include at least some evidence crucial to the Government's case, and there is no doubt that many criminal cases could be more expeditiously resolved were it unnecessary for witnesses to appear at trial. If we were to approve introduction of testimony in this manner, on this record, every prosecutor wishing to present testimony from a witness overseas would argue that providing crucial prosecution evidence and resolving the case expeditiously are important public policies that support the admission of testimony by two-way video conference. See, e.g., Remote Testimony—A Prosecutor's Perspective, 35 U. Mich. J.L. Reform 719 (2002).

"Craig requires that furtherance of the important public policy make it necessary to deny the defendant his right to a physical face-to-face confrontation. 497 U.S. at 852, 110 S. Ct. at 3167. In this case, there simply is no necessity of the type Craig contemplates. When one considers that Rule 15 (which provides for depositions in criminal cases) supplied an alternative, this lack of necessity is strikingly apparent.

"The version of Rule 15 in effect at the time of Defendants' trial states:

"'Whenever, due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order testimony of such witness be taken by deposition ....'

"Fed. R. Crim. P. 15(a) (2002). The rule continues, guaranteeing the defendant's right to physical face-to-face confrontation by specifically providing for his presence at the

26

deposition. Fed. R. Crim. P. 15(b) (2002); see also, Don v. Nix, 886 F.2d 203, 206 (8th Cir. 1989) (holding that the Sixth Amendment guarantees a criminal defendant the opportunity to be present at the deposition of an accuser); United States v. Benfield, 593 F.2d 815, 821 (8th Cir. 1979) (same); In re Letters of Request from Supreme Court of Hong Kong, 821 F. Supp. 204, 209 (S.D.N.Y. 1993) (stating that Rule 15 guarantees defendants a right to be present at deposition so as to prevent use of deposition testimony at trial from violating Sixth Amendment right to confrontation). Even a defendant in custody 'shall' be produced for the deposition, unless the defendant waives the right to be present in writing or is disruptive. Fed. R. Crim. P. 15(b) (2002). Indeed, the defendant's presence at the deposition is so important that, if he cannot afford to attend, the government may be ordered to pay the costs of travel and subsistence expenses for him and his attorney. Fed. R. Crim. P. 15(c) (2002).

"The Government argues that depositions later read into the record at trial, in fact, do occur without the defendant having been present. While that may be so, it is only the rare, exceptional case. Rule 15, properly utilized, protects a defendant's confrontation rights by affording the defendant an opportunity to be present at the deposition. United States v. Drogoul, 1 F.3d 1546, 1556 (11th Cir. 1993). It is the extraordinary circumstance where deposition testimony is taken despite a defendant's want of opportunity to be present. See, e.g., United States v. Salim, 855 F.2d 944, 949 (2d Cir. 1988) (finding that deposition may be taken, despite foreign country's refusal to allow defendant to be present but deferring question of whether admission of such a deposition would violate the Confrontation Clause). Even in those exceptional cases, courts have said that the government must have made diligent and reasonable efforts to produce the defendant at the taking of the deposition. Id. at 950-51; see

also <u>United States v. McKeeve</u>, 131 F.3d 1, 8 (1st Cir. 1997). Other circuits have recognized that failure to make such efforts, followed by use of the deposition at trial, violates the defendant's confrontation rights. <u>See, e.g.</u>, <u>Christian v. Rhode</u>, 41 F.3d 461, 465-67 (9th Cir. 1994).

"On this record, there is no evidentiary support for a case-specific finding that the witnesses and Defendants could not be placed in the same room for the taking of pre-trial deposition testimony pursuant to Rule 15. Other than stating that the witnesses would not come to the United States, the trial court gave no reason why the witnesses and Defendants could not all be in the same room for a pre-trial deposition. The district court did not find that there was anything to prevent the Defendants from traveling to Australia to be present for a Rule 15 deposition. In fact, it found that the only reason a Rule 15 deposition may not have been an appropriate alternative to the video conference was that the Government had waited too long to request such a deposition. …

"Moreover, in this case, the Government never requested a Rule 15 deposition. The Government has never maintained that any special circumstance created an inability to take such a deposition or that it would have been impossible to allow Defendants to attend such a deposition. Instead, it has argued only that testimony presented by two-way video conference is superior to testimony taken by Rule 15 deposition with witness and defendant in the same room. While that might be the opinion of some, it was not the opinion of Defendants. Should they have wished to waive their rights to confrontation, they were able to do so. In the absence of such a waiver or case-specific findings of exceptional circumstances creating the type of necessity <u>Craig</u> contemplates, however, witnesses and criminal defendants should meet face-to-face. The Sixth Amendment so requires.

"'The right guaranteed by the Confrontation Clause includes not only a "Personal examination," but also "(1) insures that the witness will give his statements under oath thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."' Craig, 497 U.S. at 845-46, 110 S. Ct. at 3163 (citations omitted). Defendants contend that the oath sworn by the Australian witnesses was not meaningful, either because it was invalid (as it was not administered in Australia, by someone authorized by federal law to give an oath outside of the United States) or because it did not subject the witnesses to a plausible threat of prosecution for perjury. We need not address these contentions. Because we find that denial of Defendants' Sixth Amendment rights to face-to-face confrontation was not necessary to further an important public policy in this case, we proceed no further with the Craig analysis. We therefore do not consider the meaningfulness of the oath as administered."

438 F.3d at 1314-18.

The State on appeal, like this Court in the main opinion, does not address Yates but relies instead on Harrell v. State, 709 So. 2d 1364 (Fla. 1998). This Court summarizes Harrell:

"In Harrell, two victims, whose residence was in Argentina, were robbed while on vacation in Florida. The State moved that the couple be allowed to testify via satellite transmission

29

because of the distance and the health problems of one of the witnesses. The court granted the State's motion, and Harrell was convicted of robbery. On appeal, Harrell argued that his right to confront his accusers was violated. In upholding the trial court's ruling, the Supreme Court of Florida adopted the analysis used by the United States Supreme Court in Craig. The court found that public-policy considerations justified remote testimony because the witnesses were beyond the subpoena power of the court; it was 'clearly in our state's interest to expeditiously and justly resolve criminal matters that are pending in the state court system'; one of the witnesses was in poor health and could not travel to the U.S.; and the two witnesses were essential to the case. Harrell, 709 So. 2d at 1369-70."

___ So. 3d at ___.

This Court's use of Harrell is problematic for at least two reasons. First, the Harrell court required the government to support its motion with evidence. Second, the Harrell court justified creating an exception to in-person confrontation by emphasizing "reliability"—a rationale that has increasingly been questioned since Harrell.

As to the showing required, the Harrell court imposed these conditions for virtual testimony:

"[I]n all future criminal cases where one of the parties makes a motion to present testimony via satellite transmission, it is incumbent upon the party bringing the motion to (1) verify or support by the affidavits of credible persons that a prospective witness resides beyond the territorial jurisdiction of the court

or may be unable to attend or be prevented from attending a trial or hearing and (2) establish that the witness's testimony is material and necessary to prevent a failure of justice. Upon such a showing, the trial judge shall allow for the satellite procedure."

709 So. 2d at 1371 (emphasis added). At the hearing on the State's motion for video testimony, the State supported its motion with only arguments from the prosecutor, and Bragg objected repeatedly to the State's lack of evidence. "'[T]he arguments of counsel are not evidence.'" Morrissette v. State, 183 So. 3d 1009, 1017 (Ala. Crim. App. 2014) (quoting and adopting the trial court's order). The problems with the trial court's approach became clear at trial when, in response to cross-examination, Laporte-Leleu testified (1) that he earned six to eight weeks of vacation time annually; (2) that he was not forbidden from traveling outside France; and (3) that, contrary to the State's representations at the hearing on its motion for video testimony, he had remained in the United States longer than "a month or less" after the alleged crimes.

As for "reliability," the Harrell court stated:

"The second part of our analysis concerns whether the procedure in this case satisfied the additional safeguards of the Confrontation Clause—oath, cross-examination, and observation of the witness's demeanor. We conclude that it did. Both of the witnesses were placed under oath by a court

31

clerk in Miami. Further, the defense had an opportunity to cross-examine the witnesses. Finally, the procedure allowed the jury to observe the witnesses as they testified, and it also allowed the witnesses to see the jury. Because each of these additional safeguards was present in the satellite procedure, we are convinced that the witnesses' testimony was sufficiently reliable. Thus, the second prong of our analysis is satisfied."

709 So. 2d at 1371.

A prevailing rationale for the allowance in <u>Craig</u> of testimony by video is an emphasis on ensuring "reliability." As I have written elsewhere, I have serious questions "about the continuing validity, after <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), of <u>Craig</u>, to the extent that it subjects a defendant's right to face-to-face confrontation to a balancing of interests." <u>Rodriguez v. State</u>, [No. CR-21-0141, July 8, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) (Minor, J., dissenting).

"As Judge Sutton of the United States Circuit Court of Appeals for the Sixth Circuit has noted, although <u>Crawford</u> did not overrule <u>Craig</u>, the two decisions are in tension on at least six points: (1) <u>Craig</u> relied almost exclusively on <u>Ohio v. Roberts</u>, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), a decision that <u>Crawford</u> overruled as to 'testimonial statements'; (2) '<u>Craig</u> treated the [Confrontation] Clause as a safeguard for evidentiary reliability as measured by the judge in that case and today's rules of evidence .... But <u>Crawford</u> held that it was a procedural guarantee that

32

"commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination" in front of the accused'; (3) <u>Craig</u> characterized the right to face-to-face confrontation as 'not absolute,' but <u>Crawford</u> described it as essential; (4) <u>Craig</u> relied on newer 'academic literature' to examine the validity of exceptions to the right of confrontation, but <u>Crawford</u> relied on 'the original publicly understood meaning of confrontation to determine when the exception-free words of the guarantee ("[i]n all criminal prosecutions") should have exceptions'; (5) <u>Craig</u> was concerned that a literal interpretation of the Confrontation Clause would abrogate current rules of evidence, but <u>Crawford</u> emphasized that rules of evidence must yield to the rights protected by the Confrontation Clause; and (6) <u>Craig</u> did not suggest 'any limit to the kinds of exceptions that the <u>Roberts</u> balancing test would allow then or in the future[, b]ut <u>Crawford</u> carefully identified the kinds of exceptions that might be allowed under its approach and conspicuously never mentions <u>Craig</u> as one of them.' <u>United States v. Cox</u>, 871 F.3d 479, 492-93 (6th Cir. 2017) (Sutton, J., concurring). I share Judge Sutton's opinion that <u>Craig</u> and <u>Crawford</u> appear to be irreconcilable. <u>Id.</u> at 493-95."

<u>Rodriguez</u>, ___ So. 3d at ___ (Minor, J., dissenting).

Our Chief Justice shares these doubts about the continuing validity of <u>Craig</u>:

"After <u>Craig</u>, the Supreme Court declared in <u>Crawford</u> that it was not willing to 'replac[e] categorical constitutional guarantees with open-ended balancing tests' based on 'amorphous notions of "reliability."' <u>Crawford</u>, 541 U.S. at 61, 67-68, 124 S. Ct. 1354. That was because '[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be

developed by the courts.' Id. at 54, 124 S. Ct. 1354. Rather, the Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.' Id. Thus, the sole question to ask to determine whether a practice that implicates the protections of the Confrontation Clause is permissible is whether an exception existed at the time of the founding under the common law.

"I believe that this method, rather than judicially created tiers of scrutiny, is the best mode of constitutional analysis. Like the scope of rights under the Second Amendment, see New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. ___, ___, 142 S. Ct. 2111, 2130, 213 L. Ed. 2d 387 (2022), or the First Amendment, see Kennedy v. Bremerton Sch. Dist., 597 U.S. ___, ___, 142 S. Ct. 2407, 2428, 213 L. Ed. 2d 755 (2022), the scope of the confrontation right under the Sixth Amendment must be determined primarily by looking to the history and tradition that define the content and contours of the right. Our role is not to 'balance' constitutional safeguards like mere 'interests,' but to enforce them as definitive protections of concrete rights. …

"In short, the Confrontation Clause protects a defendant's right to have witnesses' faces visible to the defendant and the jury. The voices of our common-law tradition, as well as decisions of the United States Supreme Court, strongly support this conclusion."

Ex parte Rodriguez, ___ So. 3d at ___ (Parker, C.J., dissenting).

Putting aside questions about the demise of Craig, if Alabama courts use Craig to allow virtual confrontation, the State and the trial court must do more than happened here. At a minimum, the State must,

34

as <u>Harrell</u> and <u>Yates</u> require, support the request with evidence. And in a case such as this, as the <u>Yates</u> court emphasized and as Bragg argued to the trial court, the State must show that it exercised reasonable efforts to secure in-person testimony by deposition under Rule 16.6, Ala. R. Crim. P. Finally, a trial court should make specific findings, based on the evidence presented, showing that the State has satisfied <u>Craig</u>. Courts should not enter a perfunctory order stating merely that <u>Craig</u> is satisfied. And courts should not, as the Court does today by citing § 12-21-135.1, justify an exception to a textually protected right by relying on a law that by its text does not apply. [9]

For these reasons, I would reverse Bragg's convictions and sentences and remand this case for new proceedings. I respectfully dissent.

---

[9]As stated above and as Bragg argued to the trial court and to this Court—and as the State conceded in the trial court—§ 12-21-135.1 applies only to members of the United States military, not members of the French military, and it requires the <u>consent</u> of the parties in a criminal case.