# IN THE COURT OF APPEALS OF IOWA

No. 23-0630
Filed January 9, 2025

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**MARIO HERNANDEZ,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg (motion for closed-circuit testimony) and Jeanie Vaudt (trial), Judges.

       A criminal defendant appeals his convictions for second-degree sexual abuse, challenging sufficiency of the evidence and the victim's closed-circuit testimony. **AFFIRMED.**

       R. Ben Stone and Alexander Smith of Parrish Kruidenier Law Firm, Des Moines, for appellant.

       Brenna Bird, Attorney General, and Thomas J. Ogden (until withdrawal) and Sheryl A. Soich, Assistant Attorneys General, for appellee.

       Considered En Banc.

**BULLER, Judge.**

Mario Hernandez appeals three convictions for the second-degree sexual abuse of his minor stepdaughter following trial by jury. He challenges the sufficiency of the evidence and argues the district court erred in allowing the child victim to testify by closed-circuit video, asserting a violation of the Iowa statute codifying the Sixth Amendment right to confront witnesses. We affirm, finding the jury could and did credit the victim's testimony and that the closed-circuit statute was satisfied by a therapist's testimony about the trauma likely to result from the child being confronted by her abuser in the courtroom.

## I.      Background Facts and Proceedings

Twelve-year-old J.D. testified by closed circuit that Hernandez repeatedly and frequently sexually abused her, starting once or twice a month around first grade and ramping up to two or three times a week by sixth grade. She told the jury that Hernandez forced her to perform oral sex on numerous occasions, touched her vagina with his finger or hand multiple times, and attempted to penetrate her vagina with his penis once. She said she did not have any choice in what sex acts she had to perform: "He'd just tell me what I would earn doing it." When asked what kind of things she "earned," J.D. explained: "Game currency, getting out of chores, letting me stay up a little longer with technology."

J.D. generally could not recall distinct instances of abuse because it happened so often. She described how Hernandez typically positioned her: "kneeled over his penis" and "sucking" on it while he was on his back on the bed. She said he sometimes touched her "boobs" through clothes while she performed oral sex on him. She remembered the one time he attempted to penetrate her

vagina with his penis because it hurt and she "screamed." And she recalled, among the multiple occasions he touched her genitals, a time his finger went "inside of [her] vagina" because it felt "bad," like "something scratch[ed] the inside." The only time she remembered sexual abuse outside the home was an incident during elementary school when he "made [her] suck on his penis in his truck" after they "were getting groceries." J.D. remembered that, before the incident in the truck, Hernandez told her "he would let [her] play on his phone if [she] would suck on his penis."

In J.D.'s words, each incident of abuse stopped "either when [Hernandez] comed [sic] inside my mouth or if he tried putting his penis inside my vagina, he'd stop when I screamed in pain." She described how she could taste "the come"—the "white stuff that comes out of, like, the penis"—and had to "spit it out on the floor." She explained she learned the word "come" from an "adult movie" Hernandez showed her that depicted "people having sex."

Although J.D. told a first-grade friend about the abuse when it started, she didn't tell any adults until a counselor in middle school asked what was going on at home that made J.D. feel unwell. When asked why she didn't tell anyone, J.D. said: "I didn't really want [Hernandez] to leave." She further explained she didn't tell her mom about the abuse because Hernandez "told [her] that they were going to take him away when [she] was younger, which [she] didn't want to happen." J.D. explained at trial that this was also the reason she didn't mention anything at a doctor's visit.

J.D. testified she had "mixed emotions" about Hernandez. There were things about him she really liked, including that he was "nice," and she enjoyed the

preferential treatment she received when it came to discipline, staying up late, playing games, and receiving gifts. When the police made Hernandez leave the family home after she reported the abuse, J.D. felt both sad and angry. She said she still cared for him as of trial, even though she knew the abuse was wrong. J.D.'s mother corroborated this, describing J.D. as "very loving towards" Hernandez and recognizing he played favorites among her children by rewarding J.D. with toys, gifts, snacks, and video games.

A forensic interviewer from a child protection center testified in generalities about the dynamics of child sexual abuse. She educated the jury about children and memory, explaining the differences in recall of one-time events or recurring events, and the difficulty in isolating details or a sequence of acts within the latter. As she put it, "kids are not their own timekeepers," so children sometimes struggle with "dates and times." She also told the jury about delayed disclosure and explained that victims of intrafamilial abuse—a family member abusing a child within the family—are often afraid to report abuse because they fear losing their relationship with the offending family member. And she explained there is a "common misconception" that an abused child "would outwardly show fear" of their abuser, when in reality children often have mixed feelings "because they love and trust and are loyal to that family member, that person that's in their lives, even though they are being sexually abused by them."

The forensic interviewer also discussed the concept of "grooming," which she defined as "the manipulation of a child victim and their environment, using different tactics to kind of manipulate that child and the environment to minimize victim resistance to the abuse, minimize the likelihood that that child is going to

disclose the abuse, and then maintain access to the child." She explained there are "lots of different ways" offenders groom victims, including normalizing sexual behavior, showing children pornography, and "special treatment" like gifts, treats, or extra attention and privileges.

Hernandez testified in his defense at trial and denied abusing J.D.—as he had previously told police. Also consistent with his police interview, he told the jury he had no explanation for why J.D. would report he sexually abused her. He said he agreed with "mostly everything" J.D. testified, other than the abuse. But he disputed the abuse could have started when J.D. was in first grade, as he was living out of state for much (but not all) of that school year.

After hearing this testimony, a Polk County jury convicted Hernandez of three counts of sexual abuse in the second degree (one count each for penis–vagina, penis–mouth, and finger–vagina contact), class "B" felonies in violation of Iowa Code section 709.3(1)(b) (2021). The court sentenced Hernandez to three consecutive terms of twenty-five years in prison, each with a mandatory minimum of seventeen and one-half years. He appeals.

## II.     Sufficiency of Evidence

Hernandez first challenges the sufficiency of the evidence, which we review for correction of errors at law. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted).

Hernandez argues he was entitled to acquittal because "[t]here was no physical or objective evidence; there was no witness testimony other than that of J.D., and there was no corroboration to bolster the testimony of J.D." The argument we should reverse because there was no corroborating evidence is a non-starter. For fifty years, Iowa law has rejected the requirement of corroboration for a sex-offense conviction. *See* 1974 Iowa Acts ch. 1271 (codified at Iowa Code § 782.4 (1975)) (repealing the corroboration requirement in sex offenses and replacing it with the rape shield law); *see also State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) (en banc) ("The only direct evidence is the complainant's testimony. But under today's law that is sufficient to convict. The law has abandoned any notion that a rape victim's accusation must be corroborated."); Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."). We reject Hernandez's claim on this basis.

He goes on to argue that J.D.'s testimony was "unreliable, and therefore unworthy of a jury's trust." But this was for the jury to decide, not for us to second-guess on a cold record. "It is not our place to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury. It is also for the jury to decide which evidence to accept or reject." *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (cleaned up). And most if not all of the arguments Hernandez advances on appeal—that it's "incomprehensible" no one else witnessed the sex abuse, that it's "inconceivable" J.D. didn't disclose the abuse sooner, and that it must not have happened because J.D. and Hernandez had an otherwise loving relationship—were debunked by expert testimony at trial. A

criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him instead of the victim.

Hernandez's final argument on sufficiency of the evidence concerns dates and times. He contends the timeline for abuse reported by J.D.—that it started when she was six years old or around first grade—conflicts with other testimony that Hernandez was working out of state most of that year. But our supreme court has previously rejected the argument that "confusion among the witnesses as to when this incident occurred fatally undermines the jury's finding of guilt." *State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999). This is because "the State does not have to elect or prove a date certain in order to prove incest, statutory rape or adultery as the exact time of the act is not material." *State v. Rankin*, 181 N.W.2d 169, 171 (Iowa 1970) (collecting cases). And the rationale for the rule is that "[a] person should not be able to escape punishment for such a disgusting crime because he has chosen to take carnal knowledge of an infant too young to testify clearly as to the time and details of such shocking activity." *Id.* at 172. Our court has held similarly in published decisions. *State v. Griffin*, 386 N.W.2d 529, 532–33 (Iowa Ct. App. 1986); *see also State v. Brown*, 400 N.W.2d 74, 77 (Iowa Ct. App. 1986). We would also reject Hernandez's complaint about dates without that precedent, as the marshaling instructions in this case gave the date range of "[o]n or about a date between January 1, 2015, and November 17, 2021." The jury could have credited testimony that Hernandez was out of state for a year or more of that date range and still found J.D. testified credibly to three sex acts within the remaining dates sufficient to support the guilty verdicts. The calendar-based complaints do not warrant relief.

Because the jury was entitled to accept the victim's testimony, corroboration was not required, and there was sufficient evidence Hernandez performed sex acts with the victim during the relevant date range, we reject Hernandez's challenges to the sufficiency of the evidence.

### III.    Confrontation

Hernandez next asserts the district court "erred when it allowed the [victim] to testify by closed circuit television, in violation of defendant's right to confront the witnesses against him."  While this appeal was pending, our supreme court decided *State v. White*, 9 N.W.3d 1 (Iowa 2024).  There, the court held the Iowa Constitution requires child victims to be confronted by their abusers, essentially disallowing at least one-way (and perhaps two-way) closed-circuit testimony that had long been permitted.  *White*, 9 N.W.3d at 11.  The state constitutional decision in *White* was a departure from both federal constitutional law and a statute passed by our General Assembly, both of which permit closed-circuit testimony under certain circumstances.  *See Maryland v. Craig*, 497 U.S. 836, 855 (1990); Iowa Code § 915.38 (Supp. 2022).  So we must decide whether the question before us concerns the state constitutional holding of *White* or the state statute and federal constitutional holding of *Craig*.  We look first to see whether error was preserved under the state constitution, then consider the standard of review and merits.

### A.  Error Preservation

Before trial, the county attorney moved to allow J.D. to testify by closed circuit, citing section 915.38, *Craig*, and a few state-court decisions interpreting the Sixth Amendment.  Hernandez resisted, citing section 915.38, *Craig*, the "Sixth Amendment to the Federal Constitution," and state and federal cases interpreting

the Sixth Amendment. Argument from both parties at the hearing on the motion similarly concerned section 915.38, *Craig*, and state cases interpreting the same. And, in an order granting the closed-circuit motion, the court entered a ruling that tracked the language of *Craig* and statutory elements of section 915.38, without any reference to the state constitution.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). We have carefully reviewed the pleadings and transcripts in this case, and we discern no argument from Hernandez raising a confrontation argument under the state constitution, nor was there any ruling from the district court deciding the same. We are a "court for the correction of errors at law," Iowa Code § 602.5103(1), and we cannot correct an "error" the district court never made. *Cf. State v. Gomez Medina*, 7 N.W.3d 350, 355 (Iowa 2024).

In oral argument before our court, counsel for Hernandez seemed to argue either that error was preserved by the general references to confrontation in his pleadings or that he was not required to preserve error because he could only obtain relief if controlling precedent were overruled in his favor. We are not persuaded by either contention. Even if we were to generously construe his pleadings as raising a claim under the state constitution, Hernandez never obtained a ruling. And even if he had raised a state-constitution claim the district court overlooked, he did not file the Iowa Rule of Civil Procedure 1.904(2) motion required to preserve error. *See Meier*, 641 N.W.2d at 537 ("When a district court fails to rule on an issue properly raised by a party, the party who raised the issue

must file a motion requesting a ruling in order to preserve error for appeal."). Hernandez's argument about the futility of asking to overrule existing case law is similarly unavailing. Because Hernandez did not raise or obtain a ruling on his state-constitution clam of error, this case is different than *Williams*, where the district court decided a rule-based speedy-trial claim and the State as appellee argued on appeal the district court was correct even if that required overruling precedent. *See State v. Williams*, 895 N.W.2d 856, 859–60, 859 n.2 (Iowa 2017), *superseded on other grounds by* Iowa R. Crim. P. 2.33. And last, even if we viewed error-preservation as a close question—and we don't—Hernandez did not brief an Iowa Constitution claim, only citing *White* and cases about retroactivity in notices of additional authorities after briefing. This comes too late, and the claim was not timely raised for our review. *See Blomgren v. City of Ottumwa*, 227 N.W. 823, 824 (Iowa 1929) ("The errors relied upon for reversal set out in appellant's original brief measure its full right of review.").

We conclude no question relating to the Iowa Constitution is before us, so our review is confined to contentions under Iowa Code section 915.38 and *Craig*. *See White*, 9 N.W.3d at 11 ("[W]e will continue to view *Craig* as binding precedent for purposes of *federal* rights under the Sixth Amendment to the United States Constitution."). In our view, at least for purposes of this case and based upon the arguments of the parties, the procedures of section 915.38 and the protections of *Craig* are one and the same—section 915.38 codifies *Craig* by statute.

**B. Standard of Review**

The standard of review is not disputed between the parties and was recently reaffirmed by the supreme court. "We review the district court's application of

[section] 915.38 for correction of errors at law. Under this standard of review, we are bound by the district court's well-supported factual findings but not its legal conclusions." *Gomez Medina*, 7 N.W.3d at 356 (cleaned up). To the extent Hernandez's argument is that the Sixth Amendment could provide more protection than the statute (and we recognize he could not offer any examples of this at oral argument), "we review de novo the totality of the circumstances." *State v. Rupe*, 534 N.W.2d 442, 444 (Iowa 1995).

## C. Discussion

In pertinent part, our statute implementing the Sixth Amendment right to confrontation provides:

> Upon its own motion or upon motion of any party, a court may protect a minor, as defined in section 599.1, from trauma caused by testifying in the physical presence of the defendant where it would impair the minor's ability to communicate, by ordering that the testimony of the minor be taken in a room other than the courtroom and be televised by closed-circuit equipment for viewing in the courtroom. However, such an order shall be entered only upon a specific finding by the court that such measures are necessary to protect the minor from trauma. Only the judge, prosecuting attorney, defendant's attorney, persons necessary to operate the equipment, and any person whose presence, in the opinion of the court, would contribute to the welfare and well-being of the minor may be present in the room with the minor during the minor's testimony. The judge shall inform the minor that the defendant will not be present in the room in which the minor will be testifying but that the defendant will be viewing the minor's testimony through closed-circuit television.

Iowa Code § 915.38(1)(a). In other words, the district court must make a "specific finding" that closed-circuit testimony is "necessary to protect the minor," with specific reference to "trauma caused by testifying in the physical presence of the defendant where it would impair the minor's ability to communicate." *Id.* This statutory text, using nearly identical language to *Craig*, implements that case's

requirement the court find: (1) closed-circuit testimony is "necessary to protect the welfare of the particular child witness who seeks to testify"; (2) "it is the presence of the defendant that causes the trauma," not "the courtroom generally"; and (3) that the trauma or emotional distress inflicted on the child "is more than *de minimis*, *i.e.*, more than mere nervousness or excitement or some reluctance to testify," such that it impairs the child's ability to communicate.  497 U.S. at 855–56 (cleaned up).

The district court held an evidentiary hearing to evaluate the application of section 915.38 in this case.  The record included both live testimony from J.D.'s therapist and a letter outlining her professional opinion.  The letter provided:

> I am the therapist of [J.D.] and am writing regarding [J.D.] being able to give her testimony for the case of Mario Hernandez via closed-circuit.  I am recommending that [J.D.] be able to do this to have space to adequately share her experience and to avoid further traumatization and/or regression.
> If [J.D.] is subjected to giving her testimony in front of the defendant, [J.D.] may withdraw or may not be as open with what she shares regarding the defendant.  [J.D.] has demonstrated behaviors of withdrawing when she thinks that she is in trouble.  [J.D.] has demonstrated magical thinking regarding her former relationship with the defendant and has expressed ambivalent feelings regarding the defendant.  [J.D.] may avoid saying anything that would reflect negatively on the defendant due to a sense of loyalty to him.
> Feelings of fear regarding the defendant have been explored in therapy.  [J.D.] has reported that the defendant used coercion and bribery in the past when he has sexually assaulted her.  [J.D.] also has reported that she experienced threat of negative repercussions if she did not follow what the defendant expected.
> Since the sexual abuse occurred, [J.D.] has reported confusion regarding what appropriate boundaries and relationships with adult males look like.  [J.D.] needs adults to be able to set and maintain appropriate boundaries as the sexual assault created an experience where an adult that she understood as trustworthy violated her boundaries.  This also will assist with [J.D.] rebuilding trust with adults to be able to keep her safe.  [J.D.] having additional exposure to her offender could result in regression and setbacks

regarding progress that has been made in therapy, including regarding addressing appropriate boundaries.

In testimony, the therapist explained she specialized in working with children and was certified as a trauma-focused cognitive behavioral therapist. She had been regularly seeing J.D. in therapy for about ten months as of the hearing.

The therapist testified that, in her professional opinion, she was recommending closed-circuit testimony based on concerns J.D. expressed about seeing Hernandez again and the therapist's professional opinion J.D. "could be triggered," "shut[] down," regress, or not be able to fully communicate if required to testify in Hernandez's presence. She also testified regarding child abuse accommodation syndrome, in which children can retract their statements concerning abuse in the presence of their abuser. She detailed some of the grooming behavior Hernandez engaged in during the extended course of sexual abuse—like buying J.D. snacks, being more lenient with her than her siblings, and treating her as his "favorite"—and how these can lead to "trauma" that does not manifest as the type of fearful behavior people might expect. For example, the therapist explained that sometimes trauma manifests as "identifying with the aggressor," similar to Stockholm Syndrome. She also recounted how J.D. told her Hernandez used "coercion" and "bribery" during the course of the abuse. Based on the totality of the grooming and family dynamics, the therapist described how there was a "trauma bond" between Hernandez and J.D., in which J.D. sought to please Hernandez throughout the cycle of affection and abuse.

The therapist answered "yes" when asked if she had concerns J.D. would be "traumatized by the presence of the defendant." She described how J.D. had

"magical thinking" in part due to the grooming and agreed that in-person testimony could "trigger long-term harm or trauma." The therapist explained in-person testimony could undermine J.D.'s sense of safety, which would set her progress back and harm her ability to "address the trauma that's occurred" through the abuse. When asked if the trauma or communication difficulties inflicted by testifying in-person would be more than general nervousness, the therapist said "yes" and explained that J.D. may falsely recant the abuse allegations even though it happened. And she noted that, since the time of depositions, J.D. had regressed and "been more irritable."

On cross-examination, the therapist was asked if the trauma she was describing related to J.D. was the same as any other child who testifies in court, and the therapist responded that she "disagree[d]" because J.D. testifying in front of her abuser could be a "trigger." The therapist admitted she "can't predict the future" but stuck by her recommendation for closed-circuit testimony and her professional opinion that in-person testimony would likely be traumatic for J.D., even if it manifested in a way other than fear. She also testified that, although Hernandez may not communicate directly with J.D. because of the criminal no-contact order, she was still concerned about coercion by "having him in the room" as "there could be subtle tricks, subtle facial movements that anyone else may not be aware of, but because of the former relationship, [J.D.] may be."

After hearing testimony and receiving the letter and the therapist's curriculum vitae, the district court entered the following order:

> After hearing in this matter and over the resistance of [Hernandez], the Court grants the State's request that the child witness in this matter testify by closed circuit means.

The Court finds that the evidence demonstrates that it is necessary to protect the child witness from trauma. Expert testimony at the hearing in this matter provided sufficient proof that the child witness in this matter would suffer trauma if the witness testified in the personal presence of [Hernandez].

At trial, J.D. testified by closed circuit using what the court described as the "standard procedure" for the county—with counsel, the judge, the court reporter, and J.D. in a deposition room and Hernandez in the courtroom.[1]

Hernandez argues the record was insufficient to support the district court's fact-findings. Much of Hernandez's attack on appeal is that he characterizes the therapist's testimony as speculative or lacking specificity. We disagree. Hernandez did not offer any competing expert testimony, and we are not convinced his cross-examination of the therapist meaningfully undermined any of her opinions. Expert testimony is almost always the province of probabilities rather than absolute certainties, and we discern no error in the district court accepting the therapist's testimony, which was made with "a reasonable degree of professional mental health certainty." And we think, contrary to Hernandez's claim, there were quite a few specifics both in the therapist's letter and her testimony—including references to J.D.'s "ambivalent feelings," Hernandez grooming her, her difficulties with appropriate boundaries, and the risks of regression or even recantation. As demonstrated in our lengthy recitation of the facts from the evidentiary hearing, we find substantial evidence supports the district court's findings of fact. And, to the

---

[1] There is some ambiguity in the record as to whether the closed-circuit testimony in this case was one-way or two-way. Because this case concerns section 915.38 and *Craig*, rather than the Iowa Constitution, that distinction does not matter. *See White*, 9 N.W.3d at 10 (noting federal law permits one-way closed-circuit video).

extent constitutional concerns are in play, our independent review confirms this record satisfies the statute and *Craig*.

Trauma wears many masks, and its manifestations are not limited to outward expressions of fear. The record established that not every abused child expresses fear of their abuser, and J.D.'s therapist opined that J.D. testifying in Hernandez's physical presence could be a psychological or traumatic "trigger" in other ways. This opinion was grounded in facts relating to J.D.'s statements about Hernandez, her behavior after the deposition, Hernandez's history of grooming J.D. to manipulate and coerce her behavior, and the risk that nonverbal cues through his physical presence could traumatize J.D. and affect her testimony. While there is little or no record evidence J.D. might fear overt violence or physically retreat from Hernandez, we conclude the therapist's testimony that J.D. could "withdraw," might not fully communicate, and may even recant the allegations amounts to "trauma" within the scope of the statute. And we find the "trauma bond" between J.D. and Hernandez; her "magical thinking" and desire to please him; as well as the risk of regression, setback, or "long-term harm or trauma" caused by in-person testimony were all legitimate child-welfare concerns protected by section 915.38. The district court did not err in finding the statute was satisfied.

Our conclusion on this question is in line with our past decisions. For example, we have previously affirmed use of closed-circuit testimony without any testimony from a therapist or other expert witness. *See State v. Mosley*, No. 01-1118, 2002 WL 985697, at *1 (Iowa Ct. App. May 15, 2002). So we would be hard-pressed to say, as a matter of law, the district court erred in crediting the

qualified expert witness here. We have also recognized that difficulties in communication due to an abuse victim's "detached state" were sufficient to satisfy the statute and *Craig*. *See State v. Bailey*, No. 01-0955, 2002 WL 31308238, at *2–3 (Iowa Ct. App. Oct. 16, 2002). So too for the risk an abuse victim "might potentially shut down" when facing their abuser in court. *See State v. McDonnell*, No. 08-0798, 2009 WL 1492839, at *3–5 (Iowa Ct. App. May 29, 2009). And for another child who "love[d] and would like to see" her abuser again, despite the abuse. *See State v. Pantaleon*, No. 15-0129, 2016 WL 740448, at *4 (Iowa Ct. App. Feb. 24, 2016). On the other end of the spectrum, the treating therapist's testimony here is distinguishable from our unpublished decision in *State v. Richards*, a State's appeal where an expert testified "*generally* about what *children* who are abused go through" and never offered opinions particular to the child in that case. No. 07-0916, 2008 WL 2042615, at *3 (Iowa Ct. App. May 14, 2008). Bottom line, our precedent supports the district court's closed-circuit order.

Our review confirms the district court's fact-findings were supported by substantial evidence, and we are convinced the trauma and emotional distress disclosed in this record—which reflects an unhealthy bond, a risk of psychological regression, and the danger of recantation or coerced testimony—is sufficient to satisfy Iowa Code section 915.38 and federal case law. We affirm the district court's closed-circuit ruling based on the evidentiary record and specifics offered by J.D.'s therapist.

## IV.    Disposition

We hold Hernandez's convictions were supported by substantial evidence because the jury was permitted to credit the victim's description of the abuse, Iowa

law does not require corroboration of victim testimony, and we do not second-guess a jury's verdict based on debunked arguments about the dynamics of child sexual abuse. We also conclude Hernandez's statutory and federal constitutional rights were not violated by the victim's closed-circuit testimony, as trauma wears many masks and the district court's findings were supported by evidence of the child's "trauma bond" and "magical thinking" toward her abuser.

**AFFIRMED.**

All judges concur except Badding, J., specially concurs.

**BADDING, Judge** (concurring specially).

I concur in the opinion of the court. But I write separately to state that this case should not be used as a blueprint for the evidence that is needed to meet the requirements of Iowa Code section 915.38(1)(a) (Supp. 2022) and *Maryland v. Craig*, 497 U.S. 836, 855–56 (1990). As the United States Supreme Court emphasized in *Crawford v. Washington*, an accused's right "to be confronted with the witnesses against him" under the Sixth Amendment's Confrontation Clause is a "bedrock procedural guarantee" that applies to both federal and state prosecutions. 541 U.S. 36, 42 (2004); *see also State v. White*, 9 N.W.3d 1, 7–8 (Iowa 2024) (discussing the fundamental role that the face-to-face confrontation right in the Sixth Amendment has played in judicial proceedings). While the "face-to-face confrontation requirement is not absolute" under the federal constitution, that "does not, of course, mean that it may easily be dispensed with." *Craig*, 497 U.S. at 850.

To satisfy the *Craig* test, and our statute implementing that test, there must be "*case-specific*" findings that closed-circuit testimony "is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* at 855 (emphasis added); *see also* Iowa Code § 915.38(1)(a) ("[S]uch an order shall be entered only upon a specific finding by the court that such measures are necessary to protect the minor from trauma."). The therapist here spoke mostly in generalities, leaving us to fill in the blanks with inferences from her statements to get to the requisite finding of necessity.

For instance, at the hearing on the State's motion, the therapist talked about child sexual abuse accommodation syndrome but did not state whether J.D.

suffered from that syndrome or any other mental-health diagnosis. She referenced "a study that has stated that oftentimes children . . . retract[] [their] statements" in response to sexual abuse, but she stopped short of explaining what that study suggests about J.D.'s case. *Cf. State v. Gomez Medina*, 7 N.W.3d 350, 356–57 (Iowa 2024) (finding closed-circuit testimony was necessary based in part on a therapist's testimony that the victim suffered from anxiety, depression, and post-traumatic stress disorder).

The therapist's testimony about the trauma the child would suffer from testifying in Hernandez's presence was similarly obscure. The prosecutor asked if the therapist had any concerns about the child's truthfulness if required to testify. The therapist answered, "Yes, I would have concerns based off of my client's responses when she's felt like she has gotten in trouble before with withdrawing or shutting down. So not being able to provide as open communication in regards to testimony." When asked for examples of what that looks like, the therapist replied, "She will get quieter, will not be as talkative as she usually is, and appears tearful." *Cf. State v. Nuno*, No. 17-1963, 2019 WL 1486399, at *2 (Iowa Ct. App. Apr. 3, 2019) (noting a child who was permitted to testify by closed-circuit television suffered from a "complex trauma history" that her counselor testified would prevent her from verbalizing her allegations and result in the child becoming "flooded with trauma symptoms," experience "difficulty with regulating herself," and make her presenting symptoms more severe). Later, on cross-examination, the therapist agreed that the child withdrawing was not specifically related to Hernandez: "It would be any time that she gets in trouble." *Cf. Craig*, 497 U.S. at 856 ("The trial court must also find that the child witness would be traumatized, not by the

courtroom generally, but by the presence of the defendant."). And while the therapist testified that the child was more irritable after a deposition and "concerns [were] expressed regarding boundaries," she did not expand on what those concerns were. The therapist also failed to explain what Hernandez's presence would "trigger," instead simply testifying: "I have concerns that she could be triggered by his presence."

Despite this vague testimony, the therapist did answer yes when asked whether each *Craig* requirement was present. She also talked about the child's "trauma bond" with Hernandez, its effect on the child's ability to testify in Hernandez's presence, and her concern that the child could regress if she testified without the closed-circuit protections. Reading between the lines, this testimony was just enough to satisfy section 915.38(1) and *Craig*. In reaching this conclusion, I agree with my colleagues that trauma wears many masks beyond outward expressions of fear. But more should be presented in the future to ensure that the *Craig* exception does not "swallow[] the constitutional rule." *Marx v. Texas*, 120 S.Ct. 574, 575 (1999) (Mem.) (Scalia, J., dissenting from denial of certiorari); *see also Danner v. Kentucky*, 119 S.Ct. 529, 530 (1998) (Mem.) (Scalia, J., dissenting from denial of certiorari) ("It is a dangerous business to water down the confrontation right so dramatically merely because society finds the charged crime particularly reprehensible. Indeed, the more reprehensible the charge, the more the defendant is in need of all constitutionally guaranteed protection for his defense.").